## DONALD W. ELMORE, ET AL.

### V.

## VIRGINIA NATIONAL BANK, ET AL.

Record No. 831694

November 26, 1986

Present: All the Justices

*J. Rodney Johnson (D. Wayne O'Bryan; Chandler, Franklin and O'Bryan, on briefs), for appellants.*

*David R. Johnson (Julious P. Smith, Jr.; William S. Smithers, Jr.; Howard W. Dobbins; George A. Warthen; Alexander N. Simon; Williams, Mullen & Christian; Thompson, Savage & Smithers; Wallerstein, Goode & Dobbins*, on briefs), for appellees, Madeline E. Robinson, Mary M. Tucker, Louis Elmore, Jr., Diana Chandler, Susan Williams, Robert W. Overbey, Joan S. Pusey, Mark Pusey, Kim Pusey, Jean S. Warren, Wade D. Warren, Carter Warren, and Deborah W. Snell.

No briefs or arguments for appellees, Virginia National Bank, Robin Tucker, Chris Chandler, Michelle Williams, Chad Williams, and R. A. Elmore, IV.

COCHRAN, J., delivered the opinion of the Court.

Virginia National Bank, as trustee under a 1957 spendthrift trust agreement, brought this chancery suit in the trial court seeking construction of certain provisions in the trust agreement and determination whether a 1975 attempt to modify the agreement was effective. The chancellor ruled that the trust agreement made no provision for amendment so that the 1975 attempt to modify it, without the consent of all potential beneficiaries, was ineffective. No appeal was taken from this ruling. The chancellor also ruled that the provision of the original agreement that, upon the grantor's death without issue, the trust estate should go to her "nearest living paternal kindred" was clear and unambiguous, that extrinsic evidence of the grantor's intent was inadmissible, and that two first cousins of the grantor were entitled to the trust estate to the exclusion of others who would have acquired interests therein if the statute of descent and distribution, Code § 64.1-1 to -18, had been applied.

The 1957 trust agreement was executed by Gwendolyn Agnes Elmore, grantor, six days before her marriage to Robert Winston Overbey. Specified personal property and real estate were transferred to her father, Ralph A. Elmore, trustee, in trust for the

benefit of the grantor. At her death, the trust estate was to go to her issue or if she died "without leaving children or lawful issue of children surviving her . . . to the nearest living paternal kindred of the Grantor."

The bill of complaint filed by Virginia National Bank, trustee, alleged that the Bank had succeeded Ralph A. Elmore as trustee and that the grantor survived her father and died without issue on October 27, 1981. The bill also alleged that by a deed and agreement dated May 3, 1975, between the grantor, her father, then trustee, and her husband, the grantor attempted to convey additional real property to the trust and to amend the trust agreement. Named as defendants were Robert W. Overbey, Ralph A. Elmore, III, Ralph A. Elmore, IV, Louis J. Elmore, Jr., Diana E. Chandler, Christopher Chandler, Susan E. Williams, Michelle Williams, Chad Williams, Wilton L. Point, Jr., Joan S. Pusey, Mark Pusey, Kim Pusey, Jean S. Warren, Wade D. Warren, Carter Warren, Deborah W. Snell, Donald S. Elmore, Madeline E. Robison, Mary M. Tucker, and Robin Tucker.*

Donald S. Elmore and Ralph A. Elmore, III, sought to introduce into evidence letters, memoranda, and other papers related to the trust agreement and found in the files of the attorney who drafted the original 1957 agreement and the 1975 instrument in which amendment of the agreement was attempted. These parties also sought to introduce the wills of the grantor and her father and the testimony of Louis J. Elmore, Jr., and Overbey. The chancellor excluded the proffered evidence as inadmissible hearsay without relevance or probative value. By final decree entered July 19, 1983, the chancellor ruled that Madeline E. Robison and Louis J. Elmore, Jr., were the nearest living paternal kindred of the grantor "since they were her closest blood paternal relatives living on the date of her death," and as such were entitled to the net estate. We granted Donald S. Elmore and Ralph A. Elmore, III, an appeal.

---

* Throughout the record, there are discrepancies in the spelling of the names of certain of the parties. Where it has been possible to determine the name used by the party, that name has been used in this opinion.

The following sketch outlines the paternal kindred of Gwendolyn Elmore Overbey at the time of her death, as shown by the evidence:

(Paternal Kindred of Gwendolyn Elmore Overbey)
(/ denotes persons who predeceased her)

Gwendolyn had five first cousins, Marguerite C. Point, Thelma C. Smart, Madeline E. Robison, Louis J. Elmore, Jr., and Ralph A. Elmore, II. At the time of Gwendolyn's death, Marguerite C. Point had died leaving one son, Wilton L. Point, Jr.; Thelma C. Smart had died leaving two daughters, Joan S. Pusey and Jean S. Warren; and Ralph A. Elmore, II, had died leaving two sons, Donald S. Elmore and Ralph A. Elmore, III, appellants herein. The remaining defendants, not included in the sketch, are the children of Joan S. Pusey, Jean S. Warren, and Ralph A. Elmore, III, and the children and grandchildren of Madeline E. Robison and Louis J. Elmore, Jr.

■ Each word in the phrase "nearest living paternal kindred" has a clear and definite meaning. "Nearest" means closest in degree. *See* Webster's Third New International Dictionary 1510 (1986) ("near"); Black's Law Dictionary 927 (5th ed. 1979) ("near"). "Living" means surviving. *See* Webster's at 1324; Black's at 843. "Paternal" means related through one's father. *See* Webster's at 1654; Black's at 1014. And "kindred" means blood relatives. *See* Webster's at 1243; Black's at 783.

■ The paternal blood relatives who were closest in degree to Gwendolyn, after her father, were her father's brothers and sisters, none of whom survived her. The next closest in degree of kinship to Gwendolyn were her first cousins, of whom only Madeline and Louis survived her. All her remaining paternal kindred

were at least one degree of kinship further removed from Gwendolyn. The plain and unambiguous meaning of the phrase "nearest living paternal kindred" is that, at the time of Gwendolyn's death, it referred to Madeline and Louis.

■ Contrary to appellants' contention, "kindred" is not a highly technical term whose primary meaning is determined by reference to the statute of descent and distribution. It is similar to the phrase "next of kin," which we have held is a nontechnical term whose commonly accepted meaning is "nearest in blood." *Kello* v. *Kello's Ex'rs*, 127 Va. 368, 377, 103 S.E. 633, 636 (1920); *see Boyd* v. *Fanelli*, 199 Va. 357, 361-62, 99 S.E.2d 619, 623 (1957) (clear import of will was that phrase "next of kin" meant "closest blood kin," not statutory heirs or distributees, and referred to a class of which all members would be in the same degree of kinship to testatrix). Relying on *Kello* and *Boyd*, the United States Court of Appeals for the Fourth Circuit has correctly ruled that the Virginia statute of descent and distribution did not change the common-law meaning of the phrase "next of kin" when used in an instrument. *See Fletcher* v. *Washington and Lee University*, 706 F.2d 475, 477-78 (4th Cir. 1983).

■ We do not find the decision in *Fontaine's Adm'r* v. *Thompson's Adm'r*, 80 Va. 229 (1885), relied on by appellants, to be relevant or persuasive. While it is true that we there allowed a distribution to the heirs and distributees under the statute of descent and distribution where the testatrix left her estate in trust for the benefit of her "next of kin," there was no contention in that appeal that "next of kin" referred only to those relatives closest in degree of kinship to the testatrix.

Nor are we persuaded by appellants' argument that *Bonewell* v. *Smith*, 120 Va. 431, 91 S.E. 759 (1917), and *Parker* v. *Stephenson*, 127 Va. 431, 104 S.E. 39 (1920), require a finding that use of the word "kindred" refers to those who would take under the statute. In those cases, we merely construed the word "kindred" to have such meaning in the context of Code § 2556 (1904), predecessor to Code § 64.1-9, repealed, Acts 1970, c. 568 (provision for descent in certain cases to kindred of deceased infant). *See Bonewell*, 120 Va. at 435-36, 91 S.E. at 761. As the *Fletcher* court noted, the word "kindred" retains its commonly accepted meaning when used in an instrument. 706 F.2d at 477-78.

■ A reading of the trust agreement executed by Gwendolyn leaves no doubt as to the meaning of the phrase employed to des-

ignate those who would take upon her death without issue. Within the same article of the instrument, Gwendolyn provided for disposition of the trust upon her death leaving issue, directing that the trust be divided into shares or separate trusts for her children or the lawful issue of any children predeceasing her. Upon the subsequent death of a child without issue and intestate, she provided:

> [T]he amount remaining in said trust shall in equal shares to the then remaining trusts be paid and be subject to all the terms and provisions thereof, but in the event any one of the original trusts shall have been terminated, the amount which would have been paid to that trust shall pass to the distributees of the beneficiary thereof *in accordance with the Stat[ut]e of Descent and Distribution then in effect in the State of Virginia.*

(Emphasis added.) This reference to the statute of descent and distribution, preceding by only two sentences the provision for distribution to Gwendolyn's "nearest living paternal kindred" upon her death without issue, demonstrates that the drafter of the instrument understood the import of the chosen language and intended to accomplish a different result. It is apparent that, had Gwendolyn intended the gift over upon her death without issue to pass to her statutory heirs, the drafter could and would have accomplished this result by specific reference to the statute. Employing other language, the drafter's obvious purpose was to further Gwendolyn's intent to designate a class of takers other than those determined under the statute.

Accordingly, we hold that the trial court correctly construed the phrase "nearest living paternal kindred" to refer to those blood relatives on her father's side in the closest degree of kinship to Gwendolyn. We also hold that the court correctly excluded extrinsic evidence of the grantor's intent, as there was no ambiguity in the language of the trust instrument. Finding no error in the rulings below, we will affirm the judgment of the trial court.

*Affirmed.*