PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOHN A. HORVATH,

    *Plaintiff-Appellant,*

    v.

BANK OF NEW YORK, N.A.;
CWALT, INCORPORATED,
Alternative Loan Trust 2006-45TI;
COUNTRYWIDE HOME LOANS
SERVICING, LP; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
INCORPORATED; EQUITY TRUSTEES,
LLC; AMERICA'S WHOLESALE
LENDER,

    *Defendants-Appellees,*

    and

JOHN DOE; JANE DOE; JACK DOE;
JILL DOE; QUI DOE; CHI DOE;
SAMUEL I. WHITE, PC,

    *Defendants.*

No. 10-1528

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:09-cv-01129-AJT-TCB)

Argued: March 22, 2011

Decided: May 19, 2011

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Diaz joined.

---

**COUNSEL**

**ARGUED:** Christopher Edwin Brown, BROWN, BROWN & BROWN, PC, Alexandria, Virginia, for Appellant. George Peter Sibley, III, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Appellees. **ON BRIEF:** R. Michael Smith, BROWN, BROWN & BROWN, PC, Alexandria, Virginia, for Appellant. Mark B. Bierbower, HUNTON & WILLIAMS, LLP, Washington, D.C., for Appellees Bank of New York, N.A., CWALT, Incorporated, Alternative Loan Trust 2006-45TI, Countrywide Home Loans Servicing, LP, Mortgage Electronic Registration Systems, Incorporated, and America's Wholesale Lender; Allison Melton, BIERMAN, GEESING, WARD & WOOD, LLC, Arlington, Virginia, Robert Ryan Michael, BIERMAN, GEESING, WARD & WOOD, LLC, Richmond, Virginia, for Appellee Equity Trustees, LLC.

---

**OPINION**

WILKINSON, Circuit Judge:

In October 2006, America's Wholesale Lender ("AWL") agreed to loan John Horvath $650,000. The loan was reflected in an interest-only fixed-rate note and was secured by a deed of trust on Horvath's home. In exchange for the $650,000, Horvath agreed to repay AWL in monthly installments ranging from $3,791.67 to $5,039.44.

The note allowed AWL (and any subsequent holder) to freely transfer the note. In fact, the note provided for "anyone who takes this Note by transfer" to inherit the powers of the "Note Holder," including the right to accelerate payment in

the event Horvath defaulted. Moreover, AWL endorsed the note in blank, meaning that, under Virginia law, any party who took possession of the note would have the authority to enforce it.

In 2009, the note ended up in the hands of the Bank of New York ("BNY"). After Horvath failed to make payments for over half a year, BNY foreclosed on the property. In response, Horvath filed suit, alleging that BNY lacked authority to carry out that sale. On Horvath's theory, only AWL — the original lender — had authority to foreclose on the property. This theory, however, runs counter to centuries of Virginia law. We therefore affirm the district court's dismissal of Horvath's lawsuit.

## I.

The facts of the case are largely undisputed; the parties primarily disagree on their meaning. On October 23, 2006, America's Wholesale Lender ("AWL") and John Horvath agreed to terms on a loan secured by a deed of trust on Horvath's property at 11599 Water Oak Court in Woodbridge, VA. Under the loan, Horvath received $650,000 and agreed to pay it back in monthly installments starting on December 1, 2006. Samuel I. White agreed to serve as the trustee for the loan and Mortgage Electronic Registration Systems, Inc. ("MERS") became the beneficiary.

The terms of the note and the deed of trust clarified that AWL could freely transfer the note at any time, stating, "the Lender may transfer this note." To drive that point home, the note clarified that "The Lender *or anyone who takes this Note by transfer* and who is entitled to receive payments under this Note is called the 'Note Holder.'" (emphasis added). Nor was the term "Note Holder" merely a meaningless title; whoever filled that role had the right to decide whether excess payments would be counted towards interest or principal, to

receive late charges, and to accelerate the payment of the loan in the event of default.

The deed of trust contained similarly straightforward language regarding transferability. As Section 20 explained, "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." In the event of such a sale, the deed of trust clarified that "[t]he covenants and agreements of this Security Instrument shall bind . . . and benefit the successors and assigns of Lender." Finally, the deed of trust named MERS as the beneficiary "for Lender and Lender's successors and assigns," establishing a consistent beneficiary and thereby further enhancing the ease with which the deed of trust could be transferred.

After making the loan, AWL included it in a real estate mortgage investment conduit known as the CWALT Trust. In other words, AWL pooled Horvath's loan with others and then sold shares in the pool to investors. Countrywide Servicing subsequently agreed to service Horvath's loan. Insofar as Countrywide agreed to accept all of Horvath's payments, send him any notices, and answer all of his questions about the loan, it became Horvath's single point of contact.

As a natural consequence of the securitization process, Horvath's note changed hands. As of 2009, the Bank of New York ("BNY") possessed Horvath's loan note. The deed of trust, however, remained unchanged in Virginia's real estate records. By that point, Horvath had failed to make payments on the loan for several months. The changing ownership of the note provided him no excuse: despite the transfers, Countrywide had remained as the servicer and Horvath had dealt exclusively with that company. Accordingly, a lawyer at the law firm of Bierman Geesing & Ward (acting on BNY's behalf) appointed Equity Trustees as a substitute trustee for Samuel I. White. Equity Trustees then conducted a foreclosure sale on the property on August 14, 2009.

That same month, Horvath filed his complaint in Virginia state court. The complaint alleged violations of the federal Fair Debt Collection Practices Act ("FDCPA"), the Due Process Clause, and various Virginia laws, and it named as defendants BNY, Countrywide, MERS, AWL, Equity Trustees, Samuel I. White, the CWALT Trust, and all holders of certificates in that trust. The defendants removed the case to federal court based on the FDCPA and constitutional claims, and Equity Trustees moved to dismiss the complaint in October 2009.

That motion was granted in part and denied in part on November 13, 2009, which led Horvath to file an amended complaint later that month. That complaint alleged several claims, the most salient of which was Horvath's claim to quiet title under Virginia law on the theory that the "splitting, selling, trading, and insuring of the pieces of" his mortgage had caused "the Deeds of Trust [to] split from the Notes and [become] unenforceable." On Horvath's view, the securitization of his mortgage note had voided anyone else's claim to title over the property, meaning that he now owned the property free and clear despite having defaulted on the loan.

All of the defendants except Samuel I. White moved to dismiss that complaint, and their motion was granted on January 29, 2010. The court concluded that Horvath's quiet title claim must fail because AWL's decision to transfer Horvath's note to the CWALT Trust and ultimately to BNY was proper under both the note and Virginia law. The district court further reasoned that these transfers had not changed Horvath's repayment obligations in any way. After Horvath filed several unsuccessful motions to reconsider, the parties agreed to voluntarily dismiss the remaining claims against Samuel I. White in an order the court labeled "final."[1] This appeal followed.

---

[1]Throughout the litigation, there has been some confusion as to whether the order being appealed is a final order within the meaning of 28 U.S.C. § 1291. After hearing argument and reviewing the district court's designation of its order as final, we think it appropriate to construe that order as final and appealable. *See* JA 469.

II.

For several centuries, Virginia has attempted to enhance commerce within the state by ensuring that negotiable instruments — broadly defined under Virginia law as "unconditional promise[s] or order[s] to pay a fixed amount of money," *see* Va. Code Ann. § 8.3A-104(a) — are freely transferable. Indeed, the state's policy dating back to at least 1827 has been to allow the bearer of a negotiable instrument (that is, the person to whom funds are owed) to endorse the instrument "in blank." *Whitworth v. Adams*, 26 Va. (5 Rand.) 333, 1827 WL 1200, at *45 (1827) (Cabell, J.). Such an endorsement allows the bearer to transfer the instrument freely, insofar as it makes possession the sole precondition to enforcement of the instrument. *Id.* ("[H]aving been endorsed in blank, every bearer or holder, be he agent, trustee, finder or thief, has a right to sell [the instrument], and to transfer it, by delivery."). This approach allows the parties to avoid thorny disputes about who has to pay whom, and when, in favor of a simple rule: possession permits enforcement. After all, as the *Whitworth* court observed, "[t]o compel the purchaser to go into enquiries as to the consideration, or to permit the parties to the bill to object to its payment, on any of the grounds stated, would greatly impair the negotiability of bills and notes; their most distinguishing, most useful, and most valued feature." *Id.*

Since then, Virginia law has hewed to this basic approach in a variety of ways. Principally, the state has ensured that notes remain easy to transfer by adopting the provisions of the Uniform Commercial Code governing negotiable instruments. Those provisions set forth a relatively simple set of rules. Instruments may still be endorsed in blank, *see* Va. Code Ann. § 8.3A-201(b), and once they are so endorsed, they may be negotiated (that is, transferred) "by transfer of possession alone," *see id.*; *see also id.* § 8.3A-205(b) ("If an [e]ndorsement is made by the holder of an instrument and it is not a special [e]ndorsement, it is a 'blank [e]ndorsement.'

When [e]ndorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially [e]ndorsed."). After a transfer, the recipient of an instrument obtains whatever rights the transferor had, which in the case of an instrument endorsed in blank amounts to plenary power to enforce the instrument. *See id.* § 8.3A-203(b) ("Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument."). In other words, just as before, possession of a negotiable instrument endorsed in blank permits the holder to enforce it. *Id.*; *see id.* § 8.3A-205(b) (establishing that the holder of an instrument endorsed in blank has the right to demand payment).

The upshot of these provisions is clear. Negotiable instruments like mortgage notes that are endorsed in blank may be freely transferred. And once transferred, the old adage about possession being nine-tenths of the law is, if anything, an understatement. Whoever possesses an instrument endorsed in blank has full power to enforce it. With these principles in mind, we turn to evaluating Horvath's claims.

## III.

Horvath's principal argument on appeal stems from his quiet title claim.[2] "[A]n action to quiet title is based on the

---

[2]Horvath also appeals the district court's decision to dismiss Count 2 of his complaint. That count involved a second loan in the amount of $111,000 that Horvath secured from the First Magnus Financial Corporation ("FMFC") in February 2006. Count 2 sought a declaratory judgment stating that FMFC cannot foreclose on the note, even though Horvath is in default and even though the current noteholder has made no attempt to foreclose. Having reviewed the parties' submissions, we conclude that this claim is unripe for adjudication. Insofar as no foreclosure has even been threatened, Horvath cannot yet show a "controversy . . . presented in [a] clean-cut and concrete form." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)).

premise that a person with good title to certain real or personal property should not be subjected to various future claims against that title." *Maine v. Adams*, 672 S.E.2d 862, 866 (Va. 2009). In Horvath's view, under the note, the deed of trust, and Virginia law, only AWL (as the originating lender) had the authority to foreclose on his home. Thus, the foreclosure was illegitimate, because BNY (and its substitute trustee, Equity Trustees) had no authority to carry it out.

It is difficult to see how Horvath's arguments could possibly be correct. Horvath's note plainly constitutes a negotiable instrument under Va. Code Ann. § 8.3A-104. That note was endorsed in blank, meaning it was bearer paper and enforceable by whoever possessed it. *See* Va. Code Ann. § 8.3A-205(b). And BNY possessed the note at the time it attempted to foreclose on the property. Therefore, once Horvath defaulted on the property, Virginia law straightforwardly allowed BNY to take the actions that it did.

There is no evidence that the note or deed of trust sought to curb these generally applicable provisions of Virginia law. While parties may contract around the baseline rules applicable to negotiable instruments, *see id.* § 8.1A-302(a), both the note and the deed of trust demonstrate that the parties intended to allow the documents to be freely transferred. The note, for example, established that "the Lender may transfer this Note," declared that "[t]he Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is . . . the 'Note Holder,'" and granted the note holder the right to make various decisions about the administration of Horvath's obligations and about how to deal with default. The deed of trust took similar steps, asserting that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower," and clarifying that "[t]he covenants and agreements of this Security Instrument shall bind . . . and benefit the successors and assigns of Lender." Taken together, these provisions do little to suggest that the parties intended

to depart from the Virginia code's permissive approach to transfers. In fact, they suggest precisely the opposite.

In short, it is undisputed that there was no alteration to the note or deed of trust at any time, that there was no change in its terms of payment, that Horvath was in default on his obligations, and that the note was endorsed in blank and in BNY's hands when the foreclosure sale took place. Based on these facts, it seems difficult to debate that BNY had the authority to enforce the note by appointing a substitute trustee and foreclosing on the property.

## IV.

Horvath, however, makes a number of arguments in response to this straightforward reasoning.[3]

## A.

We first address the argument Horvath presses most forcefully: that the note and deed of trust are "separate agreements" that are "governed by separate rules of enforcement." Appellant's Br. at 18. Sometimes Horvath argues that this differential treatment is a feature of Virginia law; other times he suggests that it is a product of "the securitization of the Note." Reply Br. at 11. Either way, his contention boils down to a basic principle: while BNY "*potentially* could sue on the Note pursuant to the UCC," *id.* at 8, it has no claim under the deed of trust. According to Horvath, the deed of trust is governed

---

[3]In addition to the arguments discussed below, Horvath hints that BNY should have had to prove that it had standing to enforce the note before appointing Equity Trustees to conduct a foreclosure. *See* Appellant's Br. at 16. We reject this argument. Virginia is a non-judicial foreclosure state. As Virginia law provides, in the event of default on a deed of trust, the trustee "shall forthwith declare all the debts and obligations secured by the deed of trust at once due and payable and may take possession of the property and proceed to sell the same at auction" without any need to first seek a court decree. *See* Va. Code Ann. § 55-59(7).

by the law of real property and by equitable principles, and those sources suggest that AWL is the only party that can foreclose on the property. *See* Appellant's Br. at 19-23.

But this argument is seriously flawed. For starters, both the deed of trust and the case law suggest that there is no reason to treat the note and deed of trust as governed by separate forms of law. The text of the deed of trust envisions that it will be conjoined with the note, clarifying that "[t]he Note or a partial interest in the Note (*together with this Security Instrument*) can be sold one or more times without prior notice to Borrower." (emphasis added). This provision belies any contention that the note is somehow walled off from the deed of trust.

The cases reinforce this perspective. For over a century, it has been settled that under Virginia law, interests in deeds of trust accompany the promissory notes that they secure. In other words, "deeds of trust and mortgages are regarded in equity as mere securities for the debt, and whenever the debt is assigned the deed of trust or mortgage is assigned or transferred with it." *Williams v. Gifford*, 124 S.E. 403, 404 (Va. Special Ct. App. 1924) (citing *McClintic v. Wise's Adm'rs*, 66 Va. (25 Gratt.) 448, 1874 WL 5664 (1874)); *see Stimpson v. Bishop*, 82 Va. 190, 1886 WL 2987, at *7 (Va. 1886) ("It is undoubtedly true that a transfer of a secured debt carries with it the security without formal assignment or delivery."). The transfer of Horvath's note thus necessarily involved a transfer of the underlying security.

The cases Horvath cites in response do not undermine this longstanding principle or suggest that the note and deed of trust should receive different legal treatment. Horvath relies on *Empire Management & Development Co., Inc. v. Greenville Associates*, 496 S.E.2d 440 (Va. 1998) and *Beck v. Smith*, 538 S.E.2d 312 (Va. 2000), for the proposition that the "Deed of Trust is 'of higher dignity' and better evidence of the understanding of the parties" than the note. Appellant's

Br. at 18 (quoting *Empire Mgmt.*, 496 S.E.2d at 443). But these cases involve the "merger doctrine," which "deals with extinguishing a previous contract by an instrument of higher dignity." *Empire Mgmt.*, 496 S.E.2d at 442. In other words, these cases focus on situations where a later-executed deed of trust contradicts an earlier agreement. But that doctrine has little applicability where, as here, the note and the deed of trust are *contemporaneous* documents that reflect a singular understanding between the parties. And even if the doctrine did apply, the deed of trust does not contradict the note in any meaningful way. To the contrary, it, like the note, suggests that it may be freely transferred.

Of course Horvath is right that "deeds of trust and their underlying notes are 'separate and distinct' documents." *Va. Hous. Dev. Auth. v. Fox Run Ltd. P'ship*, 497 S.E.2d 747, 752 (Va. 1998) (quoting *Jim Carpenter Co. v. Potts*, 495 S.E.2d 828, 833 n.5 (Va. 1998)). But it is equally clear that "notes and contemporaneous written agreements executed as part of the *same transaction* will be construed together as forming one contract." *Id.* (quoting *Richmond Postal Credit Union v. Booker*, 195 S.E. 663, 665 (Va. 1938)) (emphasis added). Where "neither document varies or contradicts the terms of the other, [the] terms of one document which clearly contemplate the application of terms in the other may be viewed together as representing the complete agreement of the parties." *Id.* at 752-53. Here, that "agreement" is that the note and deed of trust form part of one transaction, that the note may be transferred freely with the purchaser or recipient inheriting full rights to enforce, and that the deed of trust follows the note.

Indeed, common sense suggests that things could not be any other way. If Horvath were correct in asserting that the transfer of a note splits it from the deed of trust, *see* Reply Br. at 11, there would be little reason for notes to exist in the first place. One of the defining features of notes is their transferability, *see Whitworth*, 1827 WL 1200, at *45, but on Hor-

vath's view, transferring a note would strip it from the security that gives it value and render the note largely worthless. This cannot be — and is not — the law.

Finally, even were we to assume that deeds of trust are governed by different law than notes, the Virginia code confirms that BNY had the authority to take the steps it took. Section 55-59 of the code discusses the construction of deeds of trust and quite plainly states that "[t]he party secured by the deed of trust, or the holders of greater than fifty percent of the monetary obligations secured thereby, shall have the right and power to appoint a substitute trustee or trustees for any reason." Va. Code Ann. § 55-59(9). At the very least, at the time it appointed Equity Trustees to carry out the foreclosure, BNY held 100 percent of the monetary obligations due from Horvath by virtue of being the holder of the note Horvath signed, bringing its actions squarely within the scope of § 55-59(9).

B.

Horvath mounts one other argument for why the deed of trust trumps the note: according to him, the deed of trust's plain text *forbids* anyone but AWL from appointing a substitute trustee and foreclosing on the property. Horvath's argument here is a bit complicated, and rests on the interpretive canon that "expressing one item of a commonly associated group or series excludes another left unmentioned." *United States v. Vonn*, 535 U.S. 55, 65 (2002).

As Horvath points out, the deed of trust defines the term "Lender" as AWL and quite clearly specifies when actors *besides* the Lender may take actions to administer the deed of trust. For example, Section 7 allows the "Lender or its agent" to make "reasonable entries upon and inspections of the Property," and Section 22 requires the "Lender or Trustee" to give notice to the borrower if the Lender decides to sell the property. But the deed of trust allows only the "Lender" to "invoke[ ] the power of sale" (in Section 22) and "appoint a

successor trustee" (in Section 24). Thus, argues Horvath, while the parties allowed the Lender's agents and trustees to stand in the Lender's shoes for some purposes, "the parties . . . did not see fit to extend" the powers of sale and appointment "beyond the Lender." Appellant's Br. at 14. Therefore, only AWL can enforce the deed of trust.

This argument runs aground on other provisions of the deed of trust. Section 20 allows for the "Note or a partial interest in the Note (together with this Security Instrument) [to] be sold one or more times without prior notice to" Horvath. This provision establishes that AWL — the Lender — may sell its entire interest in the deed of trust to another party. But if Horvath's reading of the deed of trust is correct, the purchaser would be paying for a worthless document, as the purchaser would have absolutely no power to administer or enforce the deed of trust. After all, to the extent Horvath argues that AWL is the *only* party who can fulfill the role of the "Lender" under the deed of trust, the purchaser would be entirely beholden to AWL — a party who, post sale, has no remaining financial stake in the deed of trust — to manage the deed of trust after the sale.

The better reading — and the one that avoids bringing about such an absurd result — is to read the term "Lender" as applying not only to AWL but to any subsequent purchaser of the deed of trust. *See Chi. Ry. Equip. Co. v. Merchants' Bank*, 136 U.S. 268, 281 (1890) (provisions of a contract should "be construed in connection with the other provisions, so that if possible, or so far as is possible, they may all harmonize"); *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 519 (Va. 1997) ("A contract must be construed as written and as a whole with all parts being harmonized whenever possible."); *Paramount Termite Control Co., Inc. v. Rector*, 380 S.E.2d 922, 925 (Va. 1989) (same). This approach comports as well with the text of the deed of trust, for Section 13 provides that "[t]he covenants and agreements of this Security

Instrument shall bind . . . and benefit the *successors and assigns* of Lender." (emphasis added).

It is worth noting in closing that this reading has the additional benefit of making good sense. If AWL were to sell its interest in the deed of trust, it would no longer be the "Lender" in any meaningful sense: at that point, Horvath's financial obligations would run to the purchaser, not to AWL, and AWL would not be entitled to recover any funds from Horvath. On Horvath's view, by contrast, even after the point of sale, AWL — not the purchaser — would be the "Lender" and would have the right to receive monthly payments and foreclose on the property. Stating this proposition is sufficient to refute it.

## C.

Perhaps recognizing the flaws with his textual argument, Horvath comes close to conceding that any "successor in interest to AWL" can enforce the deed of trust. Reply Br. at 13. Nevertheless, Horvath mounts one final argument for why BNY is not truly the "Lender." On Horvath's view, the transfer of the note and deed of trust was invalid because it was never recorded in the land records relating to Horvath's property. According to Horvath, the land records do not reflect any "assignment . . . evidencing a transfer of interest in the Deed of Trust from AWL to any other entity," meaning there is a "break in the chain of title" on the property. Appellant's Br. at 21. Thus, "BNY's possession of the physical note is meaningless"; as the transfer was not recorded, "equitable principles" suggest that BNY had no right to enforce the deed of trust. Reply Br. at 16.

The principal problem with this argument is that it is inconsistent with Virginia law. While Virginia allows parties to transfer securities like the deed of trust, it does not require them to record such transfers in the land records. Indeed, Va. Code Ann. § 55-66.01 suggests that the assignor of a deed of

trust "at its option, *may* cause the instrument of assignment to be recorded," but goes on to make clear that "[n]othing in this statute shall imply that recordation of the instrument of assignment or a certificate of transfer is necessary in order to transfer to an assignee the benefit of the security provided by the deed of trust." Va. Code Ann. § 55-66.01 (emphasis added). In other words, parties may elect to record the transfer in the land records, but their failure to do so does not undermine the transaction in any way.

At bottom, Horvath's arguments on this score stem more from his views of what the law ought to be than from what it actually is. But even if Horvath were correct in arguing that recordation would help avoid the "fraud" that has allegedly beset the mortgage industry "at all levels," Appellant's Br. at 22, and would preserve the "sanctity of the land records," *id.* at 20, we would nevertheless still decline to accept his invitation to rewrite Virginia law. The Virginia legislature has decided to allow parties free rein to assign and transfer notes and the deeds of trust accompanying them, and if Horvath thinks the legislature struck that balance wrong, it is for the legislature to correct it.[4]

## V.

Horvath's briefs are filled with allegations of fraud in the mortgage industry and discussions of the financial crisis that has plagued the country of late. But these seem interposed

---

[4]As a last resort, Horvath argues that the appellees should not have been able to foreclose on his property because they did not suffer any losses from his default. In his view, the profits from the securitization of his mortgage must have offset any losses the appellees incurred from his default. We reject this claim as well. While Virginia law does recognize a limited "double recovery" defense to foreclosure proceedings, *see Nizan v. Wells Fargo Bank Minn. Nat'l Ass'n*, 650 S.E.2d 497 (Va. 2007), that defense does not allow individuals in default on a mortgage to offset their outstanding obligations by pointing to the mortgagee's unrelated investment income.

mainly to distract attention from what in reality is a straight-forward commercial case. The court cannot ignore the myriad sources that confirm BNY's authority to take the steps that it did — from the text of the note and deed of trust, to the provisions of the Virginia code, to the centuries of Virginia case law protecting the negotiability of commercial instruments. None of these permits us to grant Horvath undisputed title over his property in return for his default. We thus affirm the judgment of the district court.

*AFFIRMED*