WELLS, Chief Judge.
 

 McKesson Medical Management, LLC (“McKesson”) appeals from a final judgment in favor of Amanda Slavin on a theory of negligence, claiming that the trial court erred in denying its motion for a directed verdict. Because we agree that Slavin’s claim against McKesson failed as a matter of law, we reverse. We also find no merit in Slavin’s cross-appeal.
 
 [1]
 

 McKesson provided pharmacy services to Mt. Sinai Medical Center pursuant to a Pharmaceutical Services Agreement. Under that agreement, McKesson operated an on-site twenty-four hour pharmacy, multiple on-site satellite pharmacies open during regular business hours, and locked medicine cabinets located in the hospital’s surgical suites. Each surgical suite was equipped with a telephone with direct access to the hospital’s on-site around-the-clock pharmacy.
 

 On October 24, 2003, Amanda Slavin underwent exploratory surgery at Mt. Sinai to locate and repair a spinal fluid leak which presented following a prior spinal surgery. During surgery, Slavin’s neurosurgeon, Dr. Mario Nanes, instructed the circulating nurse, Waymond Jones, to obtain two ampules of methylene blue, a drug frequently used as a medical dye. Dr. Nanes, who was having trouble locating the source of the spinal fluid leak, did not advise Nurse Jones as to why he needed this drug or how he intended to utilize it.
 
 [2]
 
 Nor did Nurse Jones question the neurosurgeon as to his purposes. Rather, he retrieved the methylene blue ordered by the physician from the locked medicine cabinet located in the surgical suite and gave it to the surgical assistant, who in
 
 *310
 
 turn gave it to the doctor, who injected it into Slavin’s spine.
 

 Methylene blue, by all accounts, has been prescribed and utilized by physicians for numerous purposes for over a century. While frequently used as a dye marker or to locate leaks, it has long been (for over fifty years) contraindicated for intraspinal injection. As might be expected, as soon as Slavin regained consciousness following surgery, she presented classic signs of neurotoxic poisoning and ultimately developed a rare form of arachnoiditis, a painful condition which causes widespread damage to the nervous system — injuries which are progressive, intensely painful and irreversible.
 

 Slavin subsequently brought suit against Dr. Nanes, Mt. Sinai, and McKesson alleging various negligence claims.
 
 [3]
 
 As to McKesson, Slavin alleged, among other things, that it breached a duty of care to her by failing to establish appropriate procedures for the management, stocking and dispensation of the drugs stored in the surgical suite medicine cabinet, by failing to provide written or oral warnings of the contraindications of methylene blue to Dr. Nanes during surgery, and by failing to comply with its agreement with Mt. Sinai to adequately train and counsel hospital staff regarding medications retrieved from the medicine cabinet.
 

 McKesson’s motion for summary judgment, which argued in part that its agreement with Mt. Sinai did not establish a duty of care to Slavin, was denied. Following a multi-day trial, a jury returned a verdict finding Dr. Nanes negligent in causing Slavin’s injuries. As to McKesson, the jury rejected both Slavin’s claim that McKesson breached a duty in stocking the drugs located in the medicine cabinet in the suite where Slavin underwent surgery and her claim that McKesson breached a duty to make -written and oral warnings of the contraindications of methylene blue available to Dr. Nanes during the intraspi-nal surgery:
 

 VERDICT
 

 [[Image here]]
 

 2. Was there negligence on the part of Defendant McKesson Medication Management LLC which was a legal cause of loss, injury, or damage to Plaintiff Amanda Slavin with regard to:
 

 the stocking of Methylene Blue ampules in the medication cabinet for the operating rooms
 

 YES_ NO/
 

 or
 

 the availability of drug information or warnings
 

 YES_ NO
 
 ¿
 

 The jury did, however, find that McKes-son breached a duty to train the hospital’s staff with respect to obtaining information (i.e., contraindications) regarding drugs during surgery:
 

 2. Was there negligence on the part of Defendant McKesson Medication Management LLC which was a legal cause of loss, injury, or damage to Plaintiff Amanda Slavin with regard to:
 

 [[Image here]]
 

 the training of the nursing or medical staff at Mt. Sinai Medical Center concerning the obtaining of information regarding medications utilized during surgery
 

 YES
 
 J
 
 NO_
 

 Damages in the total amount of $38,323,196 were assessed, with McKesson found responsible for fourteen percent of that award. McKesson’s motion for di
 
 *311
 
 rected verdict was denied, final judgment was entered, and this appeal ensued. McKesson raises a number of issues on appeal, only one of which, relating to its lack of duty, need be addressed as it is dispositive.
 

 As
 
 Clay Electric Cooperative, Inc., v. Johnson,
 
 873 So.2d 1182, 1185 (Fla.2004), explains, a cause of action sounding in negligence is comprised of four elements: duty, breach of that duty, injury proximately caused by that breach, and a resulting damage or loss.
 
 See also Delgado v. Laundromax, Inc.,
 
 65 So.3d 1087, 1089 (Fla. 3d DCA 2011) (same). To recover on such a claim, the claimant must first demonstrate that the defendant owed an “obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.”
 
 Williams v. Davis,
 
 974 So.2d 1052, 1056 (Fla.2007) (quoting
 
 Clay Electric,
 
 873 So.2d at 1185). Determining whether the claimant has made a showing that such an obligation or legal duty exists is a question of law for a court to make:
 

 The determination of the existence of a duty of care in a negligence action is a question of law. See
 
 McCain v. Fla. Power Corp.,
 
 593 So.2d 500, 502 (Fla.1992). “The duty element of negligence focuses on whether the defendant’s conduct foreseeably created a broader ‘zone of risk’ that poses a general threat of harm to others.”
 
 Id.
 
 at 502. A duty may arise from multiple sources: “(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.”
 
 Clay Elec. Co-op., Inc. v. Johnson,
 
 873 So.2d 1182, 1185 (Fla.2003) (quoting
 
 McCain,
 
 593 So.2d at 503 n. 2).
 

 Goldberg v. Fla. Power & Light Co.,
 
 899 So.2d 1105, 1110 (Fla.2005).
 

 In this case, any duty owed to Slavin would fall under the fourth category discussed in
 
 Clay Electric
 
 — that is, a duty arising from the general facts of the case. However, because the jury rejected Sla-vin’s claims that McKesson breached a duty in either the stocking of methylene blue in the surgical medicine cabinet or in making available the information and warnings about the drugs stocked in that cabinet, we need only address Slavin’s third claim, the one that the jury decided in Slavin’s favor, that McKesson had a duty to “train[ ] ... the nursing or medical staff at Mt. Sinai Medical Center concerning the obtaining of information regarding medications utilized during surgery.” According to Slavin, that duty arose of out of the Pharmaceutical Services Agreement that McKesson had with the hospital. As to this claim, we find no duty was demonstrated.
 

 According to Slavin, McKesson’s duty to train the hospital’s nursing and medical staff about obtaining information on medications utilized during surgery stemmed from schedule 2.1F of the Mt. Sinai/McKesson Pharmaceutical Services Agreement. That schedule generally obligated McKesson to conduct education programs for Mt. Sinai’s staff “pertaining to pharmaceutical services.”
 
 [4]
 
 More particularly, according to Slavin, schedule 2.1F obligated McKesson to provide those services set forth in two of McKesson’s corporate policies identified as PM125 and PM201. Slavin attempted to establish this claim through an expert witness who testified about what he thought the agreement
 
 *312
 
 and McKesson’s corporate policies said and what he believed they legally required.
 
 [5]
 

 Slavin’s expert witness testified that under the agreement, the two policies imposed a duty on McKesson to educate all of the hospital’s professional staff not only about the distribution of drugs, but also about the peculiarities and the specific properties of all drugs whenever that information was needed:
 

 Q.... Now let’s shift over to education .... Would you please tell the jury how you came to your conclusions, how you went about the task of reaching your conclusion with respect to education, starting with the agreement between McKesson and Mount Sinai.
 

 A. Well, I can’t cite chapter and verse, but contractually it’s my understanding that part of the services provided was [sic] to provide education to the professional staff of the hospital relative not only to the distribution of drugs but to
 
 the peculiarities and the specific properties of drugs when that information is needed.
 

 (Emphasis added). With respect to the retrieval of drugs from the surgical suite medicine cabinet during a surgical procedure, Slavin’s expert testified that this duty to train included “emphasizing] the importance of knowing about those drugs and the aspects that might render those drugs appropriate or inappropriate for a given patient” — which in this case meant that McKesson should have trained Nurse Jones to learn the contraindications of methylene blue prior to giving the drug to the surgical assistant, who then gave it to Dr. Nanes for administration to Slavin.
 

 However, PM125 and PM201 say no such thing. They also impose no duty on McKesson to either educate professional staff as to the “peculiarities and specific properties of drugs,” or to train “nursing or medical Staff at Mt. Sinai Medical Center concerning the obtaining of information regarding medications utilized during surgery” as Slavin’s expert opined.
 

 PM125 titled “Nursing Orientation to Pharmacy Services” states that its purpose is to “ensure that the nursing staff has undergone orientation, training, and education on pharmacy services and medication use processes in which they are involved.” To further this policy and accomplish its goal, the Director of Pharmaceutical Services is required to “collaborate” with the Department of Nursing to ensure that nurse orientation “include[s] at least the following topics”:
 

 1. Pharmacy hours of operation
 

 
 *313
 
 2. Medication Distribution System
 

 B. Intravenous Admixture Service
 

 4. Controlled Substance Procedures
 

 5. Emergency medication procedures
 

 6. After hours procedures
 

 7. Food-drug interactions
 

 8. Patient education
 

 9. Formulary
 

 10. Patient’s own medications
 

 11. Stop Orders
 

 12. STAT [emergency] versus routine orders
 

 [[Image here]]
 

 [And][b]ased on need, the Director of Pharmacy ... shall coordinate with the Department of Nursing to provide nursing education on
 
 new
 
 technology, processes, and information that impact nursing’s role in the medication use process.
 

 (Emphasis added). Nothing in PM125 obligates McKesson to educate Mt. Sinai’s staff as to “the peculiarities and specific properties” of methylene blue — or to otherwise train Mt. Sinai’s staff “concerning the obtaining of information regarding medications utilized during surgery” as the jury found — when retrieving that drug from the surgical suite medicine cabinet during surgery. Certainly, PM125 did not obligate McKesson to train Nurse Jones to learn the contraindications of methylene blue during Slavin’s surgical procedure when Dr. Nanes ordered it.
 

 PM201 similarly imposes no such duty to train on McKesson. PM201, titled “After Hours Retrieval of Medications,” states its purpose as ensuring “availability and proper retrieval of medications after normal Pharmacy hours,” and expressly states that the procedures it enumerates are to ensure controls when
 
 no on-site pharmacy is available:
 

 Policy:
 

 After hours procedures shall ensure adequate availability and control of medications
 
 when the pharmacy is closed.
 
 To deliver consistent quality, the organization has a means of providing pharmacy services
 
 when the on-site pharmacy is closed or not available.
 

 (Emphasis added). The uncontested testimony was that the pharmacy never closed at Mt. Sinai. Thus, by its terms, PM201 did not apply here. The procedures delineated in PM201 confirm this conclusion, in pertinent part providing for retrieval of medications when an on-site pharmacy is closed. Despite the fact that PM201 is directed to medication retrieval when no pharmacy is open, Slavin relied on Procedure V of PM 201 to support her claim that McKesson had a duty to train Mt. Sinai’s nurses to ascertain the contraindications of all medications ordered by a physician during surgery. Procedure V provides:
 

 V. All medications removed from the night locker or pharmacy after hours must be double checked for
 
 accuracy
 
 by another nurse or physician before being administered to the patient. Documentation of this activity should be made in the patient medication administration record (MAR).
 

 (Emphasis added). Slavin’s expert opined that this procedure “put into place a double check and balance so that each individual has to check the other — that the medication is
 
 appropriate.”
 
 (Emphasis added). Procedure V neither says nor requires any such thing.
 

 Procedure V, even if applicable, only required hospital staff to double check the “accuracy” of a drug being retrieved from the medicine cabinet, not the “appropriateness” of medications retrieved. Accurate and appropriate are two different words with entirely different meanings. Accu
 
 *314
 
 rate is defined as being exact, correct, or precise.
 
 Accuracy Definition, Merriam-webster.com,
 
 http://merriam-webster.eom/ dictionary/accuracy (last visited Sep. 21, 2011). By contrast, appropriateness is defined as being suitable, compatible, or fitting.
 
 Appropriateness Definition, Merriam-webster.com,
 
 http://memam-webster. com/dictionary/appropriateness (last visited Sep. 21, 2011). Thus, double checking for “accuracy” means professional staff removing medications from the medicine cabinet must double check to confirm that the medication being dispensed is the same as that ordered — in this case methylene blue — and in the strength and dosage form required. There is no obligation to check for “appropriateness,” which would arguably require any professional staff removing medications from the medicine cabinet to double check to confirm that the medication being dispensed was suitable for the physician’s intended purposes.
 
 [6]
 

 While Procedure V expressly requires the former, it in no manner requires the latter. It also does not expressly require training of any sort, much less training a nurse who retrieves medications from the surgical suite medicine cabinet on a doctor’s orders during surgery to determine the appropriateness of the use of the drug ordered before handing it over. Absent evidence that the parties to an agreement intended to endow a special meaning to the terms used in the agreement, the unambiguous language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words utilized.
 
 See Wood/Fay Realty Grp., Inc. v. New Aquarius Corp.,
 
 842 So.2d 914, 917 (Fla. 3d DCA 2003);
 
 see also Bergman v. Bergman,
 
 145 Fla. 10, 199 So. 920, 921 (1940). Thus, neither the Pharmaceutical Services Agreement nor any of McKesson’s policies or procedures obligated McKesson to train the hospital’s professional staff concerning the obtaining of information regarding medication utilized during surgery
 
 [7]
 
 so as to double check the appropriateness of any medication ordered by a physician.
 

 In sum, the duty claimed to be owed by this defendant was based on the misinterpretation of an inapplicable contract provision, and as such it cannot stand; the existence of a duty owed by McKesson to this plaintiff was not, therefore, demonstrated. As a matter of law, judgment in McKesson’s favor should have been granted. We further find Slavin’s cross-appeal to be without merit and affirm the trial court’s denial of her motion for a directed verdict without discussion.
 

 Accordingly, the judgment entered against the pharmacy is reversed with this matter remanded for entry of judgment in its favor.
 

 [1]
 

 . We thank the Florida Society of Health-System Pharmacists and Florida Pharmacy Association for the
 
 amici
 
 briefs filed herein.
 

 [2]
 

 . Dr. Nanes testified that he intended to use the drug as a dye to locate the source of the spinal fluid leak.
 

 [3]
 

 . Slavin settled with the hospital prior to trial.
 

 [4]
 

 . Schedule 2. IF expressly provides that ''[McKesson] shall conduct in-service educational programs for appropriate committees and staff of the Hospital pertaining to pharmaceutical services on an as needed or as requested basis.”
 

 [5]
 

 . This expert’s testimony with respect to a contract and corporate policies that he reviewed in order to reach his determinations, but to which he otherwise claimed no familiarity or knowledge of their custom and usage in the hospital pharmacy setting, amounted to an improper legal conclusion. As has been explained:
 

 While witnesses may be permitted, in a proper case, to give an opinion on an ultimate
 
 fact
 
 involved in the case, there is a strong consensus among the jurisdictions, amounting to a general rule, that witnesses may not give an opinion on a question of domestic law or on matters which involve questions of law.... The testimony of expert witnesses is, in general, confined to matters of fact, as distinguished from matters of law.... Basically expert or nonex-pert opinion that amounts to a conclusion of law cannot be properly received in evidence since the determination of such questions is exclusively within the province of the court.
 

 Bissell v. State,
 
 605 So.2d 878, 879-880 (Fla. 5th DCA 1992) (Cowart, J., dissenting) (quoting 31A Am.Jur.2d
 
 Expert and Opinion Evidence,
 
 §§ 136-138);
 
 see Edward J. Seibert, A.I.A. Architect & Planner, P.A. v. Bayport Beach & Tennis Club Ass’n, Inc.,
 
 573 So.2d 889, 891-92 (Fla. 2d DCA 1990) ("An expert should not be allowed to testify concerning questions of law.”).
 

 [6]
 

 . The evidence adduced below confirms that any such requirement would be unworkable. There is no testimony that a surgeon needs to explain his or her purposes or how he or she intends to use a medication when ordering it during surgery, making a propriety check difficult, if not impossible. Nurse Jones also testified that because he is outside the sterile field and also performing other responsibilities during a surgical procedure, he may have no idea how a doctor will use a drug requested during surgery and that he may not even be able to see how it is actually used. Marsha Parker, the only nursing expert who testified at trial, testified that nurses are not required to learn the contraindications of medications ordered by a physician during surgery, but are only required to obtain
 
 the correct medication in the requested dosage.
 

 [7]
 

 . Slavin’s expert acknowledged a "surgery exception” to the general rule that any medication must be checked by a pharmacist before being dispensed.