# Third District Court of Appeal

## State of Florida

Opinion filed February 7, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1383
Lower Tribunal No. 12-38811

_____

**HSBC Bank USA, National Association, etc.,**
Appellant,

vs.

**Joseph T. Buset, etc., et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Beatrice Butchko, Judge.

Greenberg Traurig, P.A., and Kimberly S. Mello, Jonathan S. Tannen, and Vitaliy Kats (Tampa), for appellant.

Jacobs Keeley, PLLC, and Bruce Jacobs and Court Keeley, for appellee Joseph T. Buset.

Levine Kellogg Lehman Schneider Grossman LLP, and Stephanie Reed Traband and Victor Petrescu, for Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, as amici curiae.

Before LOGUE, LUCK, and LINDSEY, JJ.

LOGUE, J.

HSBC Bank USA, National Association appeals a final judgment dismissing its mortgage foreclosure complaint in favor of the Borrowers, Joseph and Margaret Buset. At first blush, this case appears straightforward: the Borrowers stipulated to the note, mortgage, and default. And at the time the complaint was filed, the Bank was the holder of the note with an indorsement in blank that had been modified to a special indorsement to the Bank. At some point, however, the focus of this case shifted from foreclosure to securitization. Relying heavily on expert legal testimony of an out-of-state lawyer who specialized in securitization, the trial court dismissed the foreclosure after the trial. For the reasons described below, we reverse and direct the trial court to enter judgment for the Bank.

FACTS

In October 2012, HSBC Bank as Trustee for Fremont Home Loan Trust 2005-B filed a foreclosure action against the Busets. The complaint alleged that the Bank held the note and mortgage, the Busets had failed to pay, and the Bank had complied with all conditions precedent. Copies of the note and mortgage were attached to the complaint.

The evidence at trial indicated that on February 16, 2005, the Busets borrowed $192,000 from Fremont Investment & Loan (the Originator). The loan was secured by a mortgage on a residential condominium. The mortgage named Mortgage Electronic Registration Systems, Inc. (MERS) as "mortgagee."

2

Within a few months, the Originator packaged the note with others for purposes of securitization and sale to investors. In this regard, the Originator entered into a Pooling and Servicing Agreement for the "Fremont Home Loan Trust 2005-B Mortgage Backed Certificates Series 2005-B." The parties to the Agreement included the Originator, another entity as Depositor, and the Bank as Trustee.

The Pooling and Servicing Agreement required the Originator to sign blank indorsements in the following form: "Pay to the order of _____, without recourse." The note contains an undated, signed, blank indorsement in exactly that form signed by the Senior Vice President of the Originator. As required by the Agreement, the Note was transferred from the Originator, to the Depositor, to the Bank. In July 2008, the Originator entered into a voluntary liquidation. At an unknown date, the Originator's blank indorsement was converted to a special indorsement to the Bank as payee. This handwritten change was undated and unsigned.

In 2012, after the Borrowers defaulted on the note, MERS executed a recorded assignment of the mortgage to the Bank which reads "This assignment is from . . . MERS as nominee for Fremont Investment & Loan, . . . its successors and assigns . . . to HSBC Bank."

Over the course of its history, the loan had three servicers. To prove the amount of the default at trial, the Bank offered the testimony of the current servicer who proffered as business records the payment history, default letters, and payoff printout. These records indicated the Borrowers had stopped making payments by September 1, 2010. The trial court, however, excluded the documents from evidence, concluding that the Bank failed to present a sufficient foundation.

The Borrowers presented one witness, Kathleen Cully, who is admitted to the Bar of New York but not Florida. She is an expert in securitizing income flows for sale to investors, but she acknowledged she was "not an expert in Florida law." Over the Bank's objection, Ms. Cully testified to numerous legal opinions, including her opinions that the note at issue was not negotiable; that the Bank lacked standing; and that the Pooling and Servicing Agreement was violated.

After trial, the trial court dismissed the case. Throughout the final judgment, the trial court emphasized that its legal conclusions were based on Cully's opinions, mentioning Cully by name at least seven times. Regarding Cully's legal opinions, the final judgment included statements such as the trial court "gives great weight as the trier of fact to the testimony of Defendant's expert witness, Kathleen Cully," suggesting Cully's opinions presented questions of fact subject to credibility determinations rather than legal issues controlled by Florida law. The final judgment holds in relevant part that (1) the note was not a negotiable

instrument; (2) the Bank lacked standing; (3) the Bank violated the Pooling and Servicing Agreement; (4) the Servicer's business records were inadmissible; and (5) the Bank had unclean hands. The Bank timely appealed.

ANALYSIS

(1) <u>The trial court erred by admitting expert testimony on legal issues.</u>

The Bank argues that the trial court committed reversible error by permitting Ms. Cully, the Borrowers' expert witness, to testify to legal issues. We agree. Even if Cully had an expertise in Florida law, the admission of expert testimony on the legal issues central to the case was an abuse of discretion.

The law is well established that "[a]n expert should not be allowed to testify concerning questions of law." <u>Edward J. Seibert, A.I.A. Architect & Planner, P.A. v. Bayport Beach & Tennis Club Ass'n, Inc.</u>, 573 So. 2d 889, 891 (Fla. 2d DCA 1990). As this court has explained, "opinion that amounts to a conclusion of law cannot be properly received in evidence since the determination of such questions is exclusively within the province of the court." <u>McKesson Medication Mgmt., LLC v. Slavin</u>, 75 So. 3d 308, 312 n.5 (Fla. 3d DCA 2011) (citations omitted). <u>See also</u> <u>Lee Cty. v. Barnett Banks, Inc.</u>, 711 So. 2d 34, 34 (Fla. 2d DCA 1997) (stating that "[e]xpert testimony is not admissible concerning a question of law" because the resolution of legal issues "is a legal determination to be made by the trial judge, with the assistance of counsels' legal arguments, not by way of 'expert opinion'").

5

(2) The note was a negotiable instrument under Florida law.

(a) In General

The trial court concluded that the note was non-negotiable for three different reasons. First, the final judgment states "[t]he Court applies Ms. Cully's reasoned analysis as it relates to the note and mortgage for the subject loan and to Article 3 of Florida's Uniform Commercial Code." Ms. Cully opined that a promissory note secured by a mortgage was a secured interest under Article 9 and not a negotiable instrument under Article 3.

For over a century, however, the Florida Supreme Court has held such notes are negotiable instruments. Downing v. The First Nat'l Bank of Lake City, 81 So. 2d 486, 488 (Fla. 1955) (quoting Scott v. Taylor, 63 Fla. 612 (1912)) (a note and mortgage "are governed by the rules relating to negotiable paper"). And every District Court of Appeal in Florida has affirmed this principle.[1] Even if, as the trial court noted in the final order, "no Florida appellate court has yet to consider Ms. Cully's analysis," the trial court erred by failing to follow controlling precedent.

[1] See, e.g., Fed. Nat'l Mortgage Ass'n v. McFadyen, 194 So. 3d 418, 419 (Fla. 3d DCA 2016) ("Promissory notes are, by definition, negotiable instruments . . . ."); Seffar v. Residential Credit Sols., Inc., 160 So. 3d 122, 125 (Fla. 4th DCA 2015) (recognizing a promissory note as a negotiable instrument); Stone v. BankUnited, 115 So. 3d 411, 413 (Fla. 2d DCA 2013) (recognizing promissory note as negotiable instrument); Mazine v. M & I Bank, 67 So. 3d 1129 (Fla. 1st DCA 2011) (recognizing the promissory note as a negotiable instrument); Perry v. Fairbanks Capital Corp., 888 So. 2d 725, 727 (Fla. 5th DCA 2004) (noting that "[a] promissory note is clearly a negotiable instrument within the definition of section 673.1041(1)").

6

<u>Pardo v. State</u>, 596 So. 2d 665, 666 (Fla. 1992) (noting that "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts").

 (b)<u>Negotiability was not destroyed by the note's reference to the mortgage.</u>

 The second reason the trial court concluded that the note was not a negotiable instrument was Cully's testimony that the note's negotiability was destroyed because it referred to the mortgage which purportedly contained provisions limiting transferability. The final judgment's analysis in this regard was expressly rejected in <u>OneWest Bank, FSB v. Nunez</u>, 193 So. 3d 13, 15 (Fla. 4th DCA 2016).

 Although a note's negotiability may be destroyed if the note expressly incorporates a mortgage that contains terms that would limit transferability, <u>Holly Hill Acres, Ltd. v Charter Bank of Gainesville</u>, 314 So. 2d 209 (Fla. 2d DCA 1975), the <u>Nunez</u> court clarified that this principle applies only if the note expressly incorporates the terms of the mortgage: it does not apply when the note merely references the mortgage. As the Fourth District explained,

> there is a difference between a mere reference to a note being secured by a mortgage and stating that "the terms of said mortgage are by this reference made a part hereof." The former merely referred to a separate agreement, while the latter rendered the note "subject to" the mortgage, and therefore, non-negotiable.

7

Nunez, 193 So. 3d at 16. This distinction is recognized by Florida's Uniform Commercial Code. § 673.1061, Fla. Stat. ("A reference to another writing does not of itself make the promise or order conditional.").

The distinction identified by the Nunez court applies here. While the note at issue in this case mentions the mortgage ("In addition to the protections given the Note Holder under this Note, a Mortgage . . . protects the Note Holder from possible losses. . . ."),  it does not expressly incorporate the mortgage like the note in Holly Hill ("The terms of said mortgage are by this reference made a part hereof."). For this reason, it does not matter whether the terms of the mortgage would prevent negotiability if they were incorporated into the note because the terms of the mortgage were not incorporated into the note.

(c) Negotiability was not destroyed by the definition of "Note Holder."

The trial court's third reason for concluding that the note was not a negotiable instrument was Cully's testimony that the note's negotiability was destroyed by its definition of "Note Holder." The note defined "Note Holder" as "anyone who takes this Note by transfer and who is entitled to receive payments under this Note."  The final judgment reasoned that this language showed the parties intended "to contract out of the UCC definition of holder, so as to limit the right to enforce only to those who proved ownership." But this reasoning was

8

expressly rejected in <u>Horvath v. Bank of New York, N.A.</u>, 641 F.3d 617, 622 (4th Cir. 2011).

In <u>Horvath</u>, the Fourth Circuit refused to interpret identical language, which defined "Noteholder" as "anyone who takes this Note by transfer and who is entitled to receive payments under this Note," as indicating an intent to destroy the note's negotiability. <u>Id.</u> at 622.  To the contrary, the circuit court of appeals held the language meant "precisely the opposite." <u>Id.</u>  It held that a note with this language was a negotiable instrument. Like the appellate court in <u>Horvath</u>, after carefully studying this provision of the note at issue here, we cannot find any intent in this language to limit the transferability of the note in a manner that indicates an intent by the parties to destroy its negotiability.

(3) <u>The Bank had standing to foreclose.</u>

Again following Ms. Cully's testimony, the trial court concluded the Bank did not have standing because the lack of "a complete chain of endorsements on the face of the note" created a "fatal break in the chain of title."  This statement misapprehends the nature of negotiable instruments.

Because a foreclosure case is an action to enforce a negotiable instrument, standing in a foreclosure case is not based upon ownership of the note; it is based instead on whether the plaintiff is a "person entitled to enforce." § 673.3011.  The term "person entitled to enforce" is a technical, defined term in all versions of the

9

Uniform Commercial Code, including Florida's. Id. An entity may qualify as a "person entitled to enforce" for several reasons, but the most common reason is that the entity is "the holder of the instrument." Id. In a case where the plaintiff is asserting standing based upon its status as a "person entitled to enforce" because it is the holder of the instrument, proof of who owns the note is not necessary or even relevant to the issue of standing. Id. ("A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.").[2]

Proof of who owns the note, such as a chain of title, may be relevant to a dispute where a person claims his or her ownership interest trumps the interest of the holder, but the borrower cannot make this argument on its own; instead, the person making that claim must be "joined in the action and personally assert[ ] the claim against the person entitled to enforce the instrument." § 673.3051(3). Even then, ownership is not relevant to standing so much as the question of who is the ultimate beneficial owner of the proceeds of the foreclosure, an issue not normally or necessarily part of a foreclosure case. In this regard, trial courts presiding over foreclosure cases are well served to keep in mind the following "oft-overlooked point":

_____

[2] Although adopted after the filing of the complaint in this case, section 702.015, Florida Statutes (2017), Florida Rule of Civil Procedure 1.115 and Forms 1.944(a) and (b), have established pleading requirements and certifications related to a plaintiff's status as a person entitled to enforce.

10

Article 3 is sufficiently flexible to allow a single identified person to be both the "person entitled to enforce" the note, and an agent for all those who may have ownership interests in a note. This point reflects the view that so long as the maker's obligation is discharged by payment, the maker should be indifferent as to whether the "person entitled to enforce" the note satisfies his or her obligations, under the law of agency, to the ultimate owners of the note.

Veal v. Am. Home Mortg. Serv., Inc., 450 B.R. 897, 912 (B.A.P. 9th Cir. 2011).

Accordingly, because a plaintiff asserting standing based on its status as a holder of the note does not have to prove ownership, a plaintiff does not normally have to establish a "chain of indorsements" or a "chain of title." Summerlin Asset Mgmt. v Tr. v. Jackson, No. 9:14-CV-81302, 2015 WL 4065372, at *2 (S.D. Fla. July 2, 2015) ("Although Plaintiff has set forth a valid chain of assignments, the negotiation of the blank-indorsed note by transfer of possession *alone* makes Plaintiff the 'holder' of the note entitled to enforce it."); Baroni v. Bank of New York Mellon, No. 1:12-BK-10986-MB, 2016 WL 9211660, at *2 (C.D. Cal. Oct. 3, 2016) ("[The Bank] holds a negotiable instrument and has no duty to provide an unbroken chain of title."); JP Morgan Chase Bank, N.A. v. Murray, 63 A.3d 1258, 1266 (2013) ("We conclude that the Note secured by the Mortgage in the instant case is a negotiable instrument . . . . As such, we find [the Borrower's] challenges to the chain of possession by which [the Bank] came to hold the Note immaterial to its enforceability by [the Bank].").

11

Turning to the facts of this case, because the Bank asserted standing based on its status as a holder of the note, it was error for the trial court to allow the focus of the pre-trial proceedings and the trial itself to shift from the relevant issue of whether the Bank is a "person entitled to enforce" to the irrelevant issue of whether the Bank is the owner of the note. The note here contained a blank indorsement by the Originator in exactly the form required by the Pooling and Servicing Agreement ("Pay to the order of _____, without recourse"). Once this blank indorsement was made on the note, the note became bearer paper, fully negotiable by simple transfer, like a signed check made out to cash or a signed check with the payee left blank. See, e.g., § 673.2011 ("If an instrument is payable to bearer, it may be negotiated by transfer of possession alone."). Negotiability by simple transfer is one of the defining characteristic of this type of commercial paper. It reflects one major difference between a negotiable instrument and, for example, a deed to land.

Any holder then became fully entitled to fill in the blank and name a specific payee, as happened here. See § 673.2051(3) ("The holder may convert a blank indorsement that consists only of a signature into a special indorsement by writing, above the signature of the indorser, words identifying the person to whom the instrument is made payable."). See generally Grand Lodge, Knights of Pythias of

12

Fla., v. State Bank of Fla., 84 So. 528, 534 (1920) ("[A] holder for value of negotiable paper otherwise perfect has the right to fill in the name of the payee.").

Under the law of negotiable instruments, therefore, the Bank had standing because it was the holder of a note originally indorsed in blank and then specially indorsed to the Bank. See, e.g., US Bank Nat'l Ass'n v. Laird, 200 So. 3d 176, 177 (Fla. 5th DCA 2016) (concluding the Bank demonstrated it had standing when it "attached to its complaint a copy of the note and a copy of an allonge which contained a specific indorsement" to the Bank, and the Bank "later filed with the court the original note and allonge in the same condition"); Wells Fargo Bank, N.A. v. Morcom, 125 So. 3d 320, 322 (Fla. 5th DCA 2013) ("In the present case, the original note Appellant attached was endorsed in blank with Appellant's name stamped in the blank endorsement field, which, paired with section 673.3011(1), established that Appellant was the holder entitled to enforce the instrument."); McLean v. JP Morgan Chase Bank Nat'l Ass'n, 79 So. 3d 170, 173 (Fla. 4th DCA 2012) (noting a holder has standing of a note that either bears "a special endorsement in favor of the plaintiff or a blank endorsement").

(4) The purported violations of the Pooling and Servicing Agreement did not destroy standing.

The trial court further concluded that the Bank lacked standing because of violations of the Pooling and Servicing Agreement. For example, relying upon Cully's testimony, the trial court found the Bank lacked standing because the

13

"endorsement is contrary to the unequivocal terms of the PSA . . . which required all intervening endorsements be affixed to the face of the note because there was ample room for endorsements on the face of the note." This analysis missed the mark. The Borrowers are not parties to and are not third-party beneficiaries of the Pooling and Servicing Agreement. Indeed, the interests of the defaulting borrowers are adverse to the interests of the parties to the Agreement. Jepson v. Bank of New York Mellon, 816 F.3d 942, 946 (7th Cir. 2016).

Because the Borrowers are not parties or third-party beneficiaries to the Pooling and Servicing Agreement, they cannot raise purported violations of the Agreement to defend against foreclosure: "borrowers cannot defeat a foreclosure plaintiff's standing by relying upon trust documents to which the borrower is not a party." Citibank, N.A. v. Olsak, 208 So. 3d 227, 230 (Fla. 3d DCA 2016); see also Castillo v. Deutsche Bank Nat'l Tr. Co., 89 So. 3d 1069 (Fla. 3d DCA 2012) ("Because the appellant is neither a party to nor a third-party beneficiary of the trust, we find the appellant lacks standing to raise this issue and affirm the final judgment of foreclosure in favor of the appellee, as the holder of the original note and mortgage."); Jepson, 816 F.3d at 946 ("a mortgagor whose loan is owned by a trust is not an intended beneficiary of a trust, and does not have standing to challenge the trustee's possession or status as assignee of the note and mortgage

14

based on purported noncompliance with certain provisions of a PSA [Pooling and Servicing Agreement]") (citations and quotations omitted).

    (5) <u>The assignment of the mortgage did not destroy standing.</u>

As mentioned above, in preparation for the foreclosure, on June 25, 2012, MERS assigned the mortgage to the Bank in an assignment that was recorded in the public records on July 16, 2012. The mortgage had named MERS "as nominee for Lender and Lender's successors and assigns." And as reflected in the recorded assignment, MERS assigned the mortgage to the Bank "as nominee for Fremont Investment & Loan, . . . its successors and assigns." The trial court found illegality here, concluding that the assignment should have expressly identified the Depositor and the Bank by name rather referring to them in the expression "Fremont, . . . its successors and assigns." But there was nothing illegal or improper in the language used.

Moreover, the assignment of the mortgage was superfluous. It was unnecessary because Florida law has always held that the mortgage follows the note. See, e.g., <u>First Nat. Bank of Quincy v. Guyton</u>, 72 So. 460, 460 (Fla. 1916) (noting that "when a note secured by mortgage is transferred, the mortgage follows the note as an incident thereto"); <u>US Bank, NA v. Glicken</u>, 228 So. 3d 1194, 1196 (Fla. 5th DCA 2017) ("Indeed, the mortgage follows the note."). Thus, even if this

15

assignment were void or voidable, which it is not, the Bank, as holder of the note, would have the authority to foreclosure the mortgage.

(6) The Servicer's business records were admissible.

At trial, the trial court excluded from evidence the payment history, default letters, and payoff printout, concluding that the Bank failed to make a proper foundation. This also was error.

Here, the Bank's loan analyst provided substantial testimony regarding the records. According to her testimony, she did not create the records, but she was trained on how these records were created and stored. The loan was first serviced by Fremont Investment & Loan, then by Litton Loan Servicing LP, and then Litton was acquired in its entirety by the current loan servicer, Ocwen Loan Servicing, LLC. The payment history, the default letters, and the payoff printout were essential records created in the regular course and scope of the servicers' business of servicing loans and mortgages, as is standard for this industry. By industry practice, the records of the amounts paid and remaining due are made at or near the time of the payment. The records acquired from the previous servicers were subject to a boarding process although not an audit. In fact, the servicer still has access to the records of the prior servicer it acquired.

This testimony provided a sufficient foundation to admit the records. Deutsche Bank Nat'l Tr. Co. v. de Brito, No. 3D16-1466, 2017 WL 5163048, at *2

16

(Fla. 3d DCA Nov. 8, 2017) (reversing the trial court's exclusion of similar evidence based on virtually identical testimony laying the foundation of the business records). Indeed, "[w]here a business takes custody of another business's records and integrates them within its own records" the trustworthiness requirement of the records will be met in "most instances . . . by providing evidence of a business relationship or contractual obligation between the parties that ensures a substantial incentive for accuracy." Bank of New York v. Calloway, 157 So. 3d 1064, 1071-72 (Fla. 4th DCA 2015).

Significantly, the Borrowers did not present any evidence challenging the accuracy of the records. Indeed, they stipulated before trial that they had no ability to testify even to the payments they had made on the note. See WAMCO XXVIII, Ltd. v. Integrated Elec. Env'ts, Inc., 903 So. 2d 230, 233 (Fla. 2d DCA 2005) ("The [opponents to admission of the business records] did not demonstrate, and nothing in the record establishes, that the loan information WAMCO received from Bank of America was suspect or untrustworthy or that the balances that WAMCO claimed as due were incorrect.").

(7) The Bank did not have unclean hands justifying dismissal.

Finally, the trial court dismissed the case because it concluded the Bank was acting with unclean hands by trying to defraud the court. For example, the final judgment states "[t]his court finds the AOM [assignment of mortgage] in 2012

17

does not document a transaction that occurred in 2005, <u>as [the Bank] suggests</u>" (emphasis added). It is not exactly clear what the trial court intended by this language. Taken literally, the final order seems to indicate the Bank endeavored to fraudulently induce the trial court into believing the 2012 assignment occurred in 2005.

Our careful review of the record, however, revealed nothing that supports this contention. Indeed, it was the Bank that offered the assignment of mortgage into evidence; the assignment is dated on its face as June 25, 2012; the copy of the assignment offered by the Bank into evidence indicates on its face it was recorded in the public records on July 16, 2012; and the Bank's witness consistently testified the assignment was executed in 2012. We surmise that the trial court's real concern was that the form of the assignment was insufficient because it referred to the Originator's "successors and assigns" but failed to expressly name them. We rejected this argument in our discussion above.

CONCLUSION

Accordingly, the final order is reversed. This case is remanded with instructions that the trial court enter an appropriate final judgment of foreclosure.

Reversed and remanded.