Present: All the Justices

JIM CARPENTER COMPANY, ET AL.

v. Record No. 962510

OPINION BY JUSTICE LAWRENCE L. KOONTZ, JR.
January 9, 1998

JILL MYERS POTTS, ET AL.

FROM THE CIRCUIT COURT OF KING GEORGE COUNTY
Richard H.C. Taylor, Judge


The primary issue we consider in this appeal is whether the chancellor properly considered parol evidence to limit the lien of a third deed of trust to the amount of the net proceeds of the sale of a lot encumbered by that deed of trust.

### BACKGROUND

The real property that is the subject of this appeal is Lot 23 in the Eden Estates subdivision in King George County. Southface Associates, Inc. (Southface), a land developer, acquired Lot 23 along with forty-five other lots in the Eden Estates subdivision by deed dated July 28, 1989. To finance the transaction, Southface executed a first deed of trust in favor of King George State Bank and a second deed of trust in favor of the former owner of the property. The second deed of trust provides for the partial release of its lien upon the payment to the noteholder of a fixed fee of $8,409.09 per lot. For purposes of this appeal, it is undisputed that the first deed of trust provides for the partial release of its lien upon the payment of a fixed release fee of $9,000 per lot.

At the time of its acquisition of the Eden Estates lots, Southface was indebted on open accounts with Jim Carpenter Company, a building material supplier, and The Lester Group,

Inc., the latter's parent company, (collectively, Jim Carpenter) in an amount in excess of $300,000. Shortly thereafter, Southface became financially endangered and proposed a plan to Jim Carpenter under which Southface might be able to "survive th[e] economic decline" and Jim Carpenter might recover on its accounts with Southface. As a part of this "workout agreement," Jim Carpenter extended a credit line note of $100,000 to Southface, secured by a third deed of trust on the Eden Estates lots. Prior to agreeing to this workout plan, Jim Carpenter received an independent appraisal of these lots that showed they were encumbered by the previously mentioned deeds of trust and were valued at between $22,000 and $26,000 each without improvements. In essence, the parties anticipated that the sale of individual lots would provide Southface with the needed cash flow to enable it to continue in operation and to pay its indebtedness to Jim Carpenter.

As will become apparent, the partial release provision in the deed of trust in favor of Jim Carpenter is of particular significance in this appeal. The deed of trust contains a provision permitting partial releases and shows several notations referencing certificates of partial satisfaction and release concerning lots other than Lot 23. However, neither this deed of trust, nor the note it secures, contains specified terms for partial releases or an express provision for the payment of a fixed release fee per lot. Both are silent in that regard.

On February 20, 1990, Southface conveyed Lot 23 to W. T. Anderson Home Builders, Inc. (Anderson) for $24,000, the

undisputed fair market value of the lot at that time.  The fixed partial release fees were paid from the sale proceeds in accordance with the provisions of the first two deeds of trust, and Lot 23 was released by the respective trustees under those deeds of trust.  After the further payment of sales commissions and closing costs, the net proceeds from the sale were $4,527.72.  Southface did not pay these proceeds to Jim Carpenter and, although the law firm handling the closing sought a release of the property, no release from Jim Carpenter's deed of trust was given.[1]  On July 20, 1990, Anderson conveyed Lot 23 with improvements to Jill Myers Potts for $155,000.  Potts executed a deed of trust on the property to secure a note with her mortgage lender in the amount of $115,000.[2]

On November 4, 1991, King George State Bank conducted a foreclosure sale on the thirty-six lots still owned by Southface.  The net proceeds from the sale did not extinguish the first deed of trust.  Meanwhile, Southface became insolvent and filed bankruptcy proceedings.

Thereafter, on July 17, 1992, the substitute trustee under Jim Carpenter's deed of trust commenced foreclosure proceedings against Lot 23, seeking recovery of the full face amount of the credit line note, interest from its date of inception, costs and

---

[1] The facts surrounding the request for the release and Jim Carpenter's refusal to grant a release were strongly disputed by the parties.  The record is clear, however, that no release for Lot 23 was recorded in the land records of King George County.

[2] Potts was not married at the time of this conveyance and the deeds were recorded in the name "Jill Myers."

related fees. In response, on July 31, 1992, Potts and her mortgage lender filed a bill of complaint seeking an injunction to prohibit Jim Carpenter from conducting a foreclosure sale. The chancellor referred the matter to a commissioner in chancery for evidentiary proceedings. By subsequent order, the chancellor permitted Potts to add Anderson as a defendant and amended the prior decree of reference to include matters concerning Anderson's potential liability to Potts.

Anderson then filed a third-party bill of complaint against the attorneys, a paralegal, the title insurance companies and title insurer (hereafter, the third-party defendants) who participated in the closings of the conveyances of Lot 23 from Southface to Anderson and from Anderson to Potts. Anderson asserted theories of breach of contract and breach of professional responsibility by these parties, jointly and severally, and sought damages in the amount of its liability, if any, to Potts.

On March 22, 1995, Anderson sought to have the issues raised in its third-party action included in the decree of reference. The third-party defendants opposed this motion, and Anderson then withdrew the motion before the commissioner. Accordingly, the commissioner did not take evidence concerning Anderson's third-party claims or address them in his report to the chancellor.

At the subsequent hearing before the commissioner, Michael Maurice Rafferty, president of Southface, testified at length concerning the business relationship between Southface and Jim

Carpenter and the purpose of the credit line note secured by the deed of trust in favor of Jim Carpenter. As noted above, Southface was in financial difficulty and it owed considerable sums on open accounts to Jim Carpenter. The note and deed of trust, although for considerably less than the total indebtedness, was intended to give Jim Carpenter "some protection" for those accounts and to permit Southface to continue to receive supplies from Jim Carpenter. Rafferty explained that without further sales of the lots, Southface "had no possible way of paying" its debt to Jim Carpenter. With regard to the silence in the deed of trust on specified terms for partial releases or a fixed partial release fee for individual lots sold, Rafferty testified that it was mutually understood by Southface and Jim Carpenter that, upon the sale of one of the lots, Jim Carpenter would receive the net proceeds from that sale after payment of the release fees to the two superior note holders, sales commissions, and closing costs. Rafferty maintained that this understanding was reached between himself on behalf of Southface and Tommy Morris Mayo, corporate credit manager, on behalf of Jim Carpenter.

Mayo's testimony at the hearing was not wholly inconsistent with Rafferty's testimony regarding the parties' agreement concerning the payment of release fees. Mayo testified that the agreement was that he and Rafferty "would talk about the release of a lot and based upon that conversation [Mayo] would release the lot." He maintained, however, that because no such conversation ever took place with regard to Lot 23, no release

was granted. Mayo acknowledged that some lots were released in accordance with Rafferty's version of their agreement and that this was done because "I was trying to keep [Southface] afloat as best I could."[3]

Sandra H. Stein, Southface's general manager, testified that prior to each sale of a lot, she would contact Jim Carpenter's local credit manager in order to reach an agreement on a release fee. In some instances, Jim Carpenter would require no release fee at all in consideration of periodic payments being made by Southface on its general indebtedness.

Additional testimony from expert witnesses confirmed that an "established business custom" or "business practice" in the real estate development business is that the amount of the partial release fee on unimproved lots covered by a blanket deed of trust will not exceed the net sales price. One expert, Gordon B. Gay, explained that where undeveloped lots are encumbered by first and second deeds of trust, "the third is basically the net proceeds type of arrangement." He further explained that the benefit to be gained by the parties by having an unstated release fee in the third deed of trust is that "[i]t makes it more flexible between the lender and the debtor" and "[i]t helps in a workout situation."

---

[3] Mayo testified at length concerning the dispute over payments made to Jim Carpenter that were applied to the open account and not the secured note. In addition, the parties presented voluminous evidence in an attempt to prove or disprove that Southface had actually paid the net proceeds of the sale of Lot 23 to Jim Carpenter. However, the commissioner and the chancellor found that Jim Carpenter did not receive these proceeds. The record supports that finding.

Consistent with this practice, the evidence showed that on eight lots Jim Carpenter released its deed of trust in exchange for payments on the secured note in amounts not exceeding the net proceeds to Southface from the sales of the lots. In two instances, Jim Carpenter released lots subject to its deed of trust without payment.

In his report to the chancellor, the commissioner found that the evidence warranted consideration of the parol evidence concerning established business practice and the course of dealing between the parties. Based on that evidence, the commissioner recommended that Jim Carpenter be limited to recovering no more than the net proceeds of the sale of Lot 23 from Southface to Anderson.

After receiving objections from the parties, the chancellor entered a final decree, adopting the commissioner's factual findings, and awarded judgment to Potts, requiring Jim Carpenter, upon receipt of payment of $4,527.72, to issue a release from the third deed of trust on Lot 23. In accord with the commissioner's recommendation, no interest, attorney's fees, or costs related to the note or deed of trust were awarded to Jim Carpenter. The decree further assigned full liability for the payment due Jim Carpenter, including the commissioner's fee and related costs, to the third-party defendants. Anderson was "dismissed" from the suit. We awarded Jim Carpenter an appeal and accepted assignments of cross-error from the third-party defendants.

## DISCUSSION

We first consider whether the chancellor erred in

considering parol evidence to establish terms for a partial release fee where the deed of trust provided no terms beyond permitting partial releases.  In doing so, we are cognizant of the well established standard applicable to the use of parol evidence in contract disputes.[4]  As we said in <u>Pulaski National Bank v. Harrell</u>, 203 Va. 227, 123 S.E.2d 382 (1962):

> The rule which excludes parol evidence when offered to vary the terms and conditions of an integrated written contact has nowhere been more strictly adhered to in its integrity than in Virginia.  It, in effect, declares that, where parties have reduced their contract to a writing which imposes a legal obligation in clear and explicit terms the writing shall be the sole memorial of that contract, and it is conclusively concluded that the writing contains the whole contract, and is the sole evidence of the agreement.

<u>Id.</u> at 233, 123 S.E.2d at 387; <u>see</u> <u>also</u> <u>Erlich v. Hendrick Const. Co., Inc.</u>, 217 Va. 108, 112, 225 S.E.2d 665, 668 (1976).

In <u>Erlich</u>, we held that admission of parol evidence was not proper to prove the existence of an oral agreement to extend a completion deadline by altering a term in an integrated and unambiguous contract.  <u>Id.</u> at 112-13, 225 S.E.2d at 668-69.  In doing so, we rejected the argument that the silence of the contract as to possible modification of that term rendered the terms for modification of the contract subject to construction by reference to parol evidence.  <u>Id.</u>

In other instances, however, we have held that parol

---

[4]For purposes of our analysis in this appeal, we make no distinction between a contract and a deed of trust.  <u>See</u> <u>Commonwealth v. Jones & Robins, Inc.</u>, 186 Va. 30, 41 S.E.2d 720 (1947).

evidence may be properly admitted to prove the existence of additional terms to an agreement where the agreement is silent, so long as the addition of such terms is not inconsistent with the express terms of the written instrument.  See, e.g., Durham v. National Pool Equipment Co. of Va., 205 Va. 441, 447, 138 S.E.2d 55, 59 (1964)(where two contracts between the parties did not deal with the subject matter of a third agreement, parol evidence was admissible to prove existence of terms of that agreement).  In doing so, we recognized an exception to the parol evidence rule commonly called the "partial integration doctrine."

In High Knob, Inc. v. Allen, 205 Va. 503, 138 S.E.2d 49, (1964), we explained that the partial integration doctrine recognizes that the final form of a contract between parties may not reflect the complete agreement of the parties or accurately reflect the course of dealing between parties based on their complete agreement.  In such circumstances, "[w]here the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties."  Id. at 506, 138 S.E.2d at 52.  In High Knob, we went on to recognize the "collateral contract doctrine" that parol evidence is also admissible as "proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing."  Id. at 506-07, 138 S.E.2d at 52.  But cf. Wilson v. Holyfield, 227 Va. 184, 188, 313 S.E.2d 396,

398 (1984)(absence of terms normally found in a contract is insufficient in and of itself to render the contract subject to judicial construction). In High Knob, we held that where the contracts of sale of various lots were silent as to the lots' source of water, and the deeds and covenants restricted the right to establish wells, parol evidence was admissible to prove an oral agreement by the seller to provide hook-ups to its water system. 205 Va. at 508, 138 S.E.2d at 52.

Here, Carpenter's deed of trust expressly provides for partial releases for individual lots, but is silent as to the terms under which such releases would be given. This renders the present case similar to High Knob and distinguishes it from Wilson. Unlike the contract in Wilson, Carpenter's deed of trust is not wholly silent on the subject matter at issue. Rather, as in High Knob, Carpenter's deed of trust contains a provision that cannot be implemented absent additional terms or a collateral agreement.

Accordingly, we hold that the evidence supports the chancellor's finding that this deed of trust is an incomplete integration of the agreement between Jim Carpenter and Southface. Based upon the testimony about established business practices and the actual course of dealing between the parties to the deed of trust, the evidence is sufficient to establish the parties' agreement that Jim Carpenter would release its deed of trust on a particular lot in return for payment by Southface of an amount not more than the net proceeds of the sale of that lot. This conclusion does not alter any term of the deed of trust. It is

then clear that the chancellor properly determined that Jim Carpenter was entitled to recover from Potts the amount of $4,527.72, the net proceeds to Southface from the sale of Lot 23.[5]

Jim Carpenter further asserts that the chancellor erred in failing to award prejudgment interest because the note secured by its deed of trust provided for a specific rate of interest. This Court has previously addressed this precise assertion with regard to the rate of interest specified in a note.

> Where a specified rate of interest is contracted for upon an obligation, and the rate is lawful, that rate will continue to apply after maturity of the obligation, and even after judgment, until the debt is fully paid. The reason for this is the court's lack of power to dispense with the obligations of lawful and valid private contracts.

Fleming v. Bank of Virginia, 231 Va. 299, 307, 343 S.E.2d 341, 345 (1986).

Thus, we agree that Southface was obligated to pay the rate of interest specified in the note from its inception. However, as we have already explained, regardless of Southface's obligation under the note, the amount of lien of the deed of trust securing that note with reference to Lot 23 was fixed at the time of sale of that lot at a maximum of $4,527.72. To the extent that interest continued to accrue thereafter against the unpaid balance of the note, that liability could not increase the

---

[5]Jim Carpenter also asserts that any non-written agreement as to partial release fees was an improper oral modification of the note. We disagree. The note and deed of trust, though related, are distinct and separate. The trial court did not modify the note. Rather, it merely clarifies the security for that note with reference to Lot 23.

lien on Lot 23.[6]

Relying on a provision of its deed of trust that requires the grantor to reimburse the trustees and beneficiaries "for all reasonable costs, charges and attorney's fees incurred" in any suit "affecting the premises or title thereto or the interest of [the] Trustees or Beneficiaries," Jim Carpenter asserts that the chancellor erred in failing to award attorney's fees and related costs it expended in defending the present suit. The provision further states that the costs and fees "shall be secured hereby as a further charge and lien upon the premises."

Our previous analysis of Jim Carpenter's claim for interest is also dispositive of its claim for attorney's fees and related costs under this provision of its deed of trust. The amount of the lien on Lot 23 under the deed of trust became fixed and limited at the time of the sale of that lot by Southface to Anderson. Thus, even if Jim Carpenter were entitled to some or all of the costs and fees claimed, these would merely increase the lien on the lots remaining after the sale of Lot 23. In short, regardless of the total amount of principal, interest, costs, and fees secured by Carpenter's deed of trust, the chancellor properly determined that the extent of the lien against Lot 23 was fixed at $4,527.72 at the time of sale from

---

[6]The parties present differing views as to which interest provisions of the Uniform Commercial Code and the Civil Procedure Code, Title 8.01, were applicable to these proceedings. See, e.g., former Code § 8.3-122 (repealed 1993) and § 8.01-122. Our resolution of this issue does not require us to examine the application of the relevant statues since, under any analysis, the liability on Lot 23, whether for principal or principal and interest, was fixed at the time of the sale to Anderson.

Southface to Anderson.

Finally, we turn to the assignments of cross-error by the third-party defendants, challenging that portion of the final decree that required them to pay the judgment of $4,527.72, the commissioner's fee and other costs. For the reasons that follow, we do not reach the merits of the assertions of the third-party defendants.

A cross-bill filed against a third-party is a new suit. Rule 2:14. Anderson based its third-party action on the theory that, by breach of contract or by reason of malpractice, one or more of the attorneys or title insurance companies was liable to Anderson for any liability Anderson had to Potts. Potts did not file a separate claim against any of these defendants. Thus, any liability of the third-party defendants for the judgment and costs of the principal suit must be premised necessarily on a finding against Anderson on Potts' claim.

It is clear from the record that no direct evidence of the contractual liability of the title companies and attorneys or of their liability under a theory of professional malpractice was presented at the commissioner's hearing. Similarly, the commissioner did not receive direct evidence concerning the issue of Anderson's liability to Potts.

Accordingly, as developed in the commissioner's hearing, the record is inadequate to support the chancellor's decision to assign liability to the third-party defendants. Because no further evidence was taken as to these matters before the chancellor, we cannot sustain that portion of the final decree

assigning liability of any kind to the third-party defendants.

Remarkably, Potts objected to the commissioner's failure to address the issue of Anderson's liability in his report but has not challenged the dismissal of Anderson in the final decree and, accordingly, Anderson was not made a party to this appeal.  By failing to assign error to the dismissal of Anderson, Potts has severed the chain of indemnification running to the third-party defendants through Anderson, the party to whom she assigned liability.  There is no mechanism in our procedure permitting a plaintiff to appropriate as her own the claims made by a defendant against third-parties after the defendant has been dismissed.  Similarly, the unappealed dismissal of Anderson as a party precludes us from remanding the case for further proceedings to determine its liability, if any, to Potts.

For these reasons we will affirm the chancellor's award of judgment of $4,527.72 to Jim Carpenter, but will reverse that portion of the decree that assigns liability to the third-party defendants for the judgment, commissioner's fees, and related costs.  The case will be remanded for the assignment of the liability for fees and costs consistent with this opinion.[7]

<u>Affirmed in part,
reversed in part,
and remanded.</u>

[7]We express no opinion regarding Potts' right to recover from any of the third-party defendants with whom she might be in privity in a future independent action.