COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, AtLee and Raphael
Argued at Lexington, Virginia

PUBLISHED

GABRIEL SETH WORSHAM, EXECUTOR OF THE
 ESTATE OF RALEIGH ELMORE WORSHAM

                                                            OPINION BY
v.       Record No. 0663-21-3               JUDGE STUART A. RAPHAEL
                                                        JANUARY 11, 2022
KATHLEEN BONNIE CRISPIN WORSHAM,
 INDIVIDUALLY AND AS TRUSTEE OF THE RALEIGH E.
 WORSHAM QTIP TRUST

               FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                              F. Patrick Yeatts, Judge

               Paul McCourt Curley (Six East Law Group—Curley Law Firm,
               PLLC, on briefs), for appellant.

               Monica T. Monday (Glenn W. Pulley; Amanda M. Morgan;
               Timothy M. Purnell; Gentry Locke; Purnell, McKennett & Menke,
               PC, on brief), for appellees.


        Under the parol-evidence rule, when a written contract unambiguously expresses the

agreement of the parties, extrinsic evidence of the parties' prior or contemporaneous discussions

is inadmissible to contradict the written terms.  The primary issue on appeal here is whether a

post-nuptial agreement is ambiguous about whether—if the parties divorced and the husband

died first—the wife is entitled to monthly income from a trust that the husband had to establish

as a "QTIP" trust—a "qualified terminable interest property" trust for a "surviving spouse" under

§ 2056 of the Internal Revenue Code.  26 U.S.C. § 2056.  Following the couple's divorce and the

husband's death, the executor failed to transfer assets to the trust sufficient to pay the monthly

amount.  He asserted that, because the couple divorced, the trust could not be considered a

"QTIP" trust.  He contends that his interpretation is supported by parol evidence that should have

been considered by the trial court because, he claims, the post-nuptial agreement is at least ambiguous about whether the trust's obligations to the wife survived the divorce.

We conclude, however, that the post-nuptial agreement unequivocally established the wife's continuing entitlement to monthly payments from the trust, even if the parties' divorce prevented the trust from qualifying for deferred estate-tax treatment as a QTIP trust under the Internal Revenue Code. We therefore affirm the circuit court's ruling that the agreement must be enforced as written and that the executor's proffered parol evidence is inadmissible. We agree with the circuit court that the relief it awarded—requiring the executor to restore funds withheld from the trust—fell within the relief requested in the prayer for relief. We also agree that the attorney-fee award to the wife was proper under the post-nuptial agreement. We affirm and remand the case to the circuit court to determine if the wife is entitled to further attorney fees and, if so, the appropriate amount.

## I. BACKGROUND

Kathleen Bonnie Crispin Worsham married Raleigh Elmore Worsham in August 1979.[1] Raleigh had two sons from a previous marriage. Raleigh and Bonnie separated two decades later, in 2001.

In 2002, while still separated, Raleigh and Bonnie agreed to a "Post-Nuptial Agreement." The introductory clause of the agreement named the parties in full but then defined them as "Husband" and "Wife." Those terms were then used throughout the agreement to specify the parties' respective rights and obligations, including after any divorce. *E.g.*, ¶¶ 2, 7. The agreement, among other things, provided for Raleigh to pay Bonnie certain spousal support (¶ 1) and set forth their respective rights in several parcels of real property (¶¶ 2-4).

---

[1] Like the litigants, we refer to the couple as Raleigh and Bonnie.

- 2 -

This appeal centers mainly on paragraph 5 of the post-nuptial agreement, which required Raleigh to "establish, at his sole expense, a Qualified Terminable Interest Property (QTIP) trust for Wife's lifetime benefit." Raleigh promised to transfer to the trust certain real property and improvements called "Spring Street." Income from the trust was "payable to Wife on a monthly basis, during her lifetime," permitting Raleigh "to direct the disposition of the trust assets at the time of Wife's death." "Additionally," paragraph 5 provided that, at Raleigh's death, "additional assets will be added" by Raleigh's personal representative sufficient to generate a "gross monthly income equal to what the parties would call the 'Widow's Benefit.'" If Raleigh died after June 1, 2010—as later happened—the "Widow's Benefit" would be $10,000.

The post-nuptial agreement specifically contemplated the possibility of divorce. For example, paragraph 24 required that, if the parties divorced, the agreement had to be ratified and incorporated into any final divorce decree. Similarly, paragraph 35 provided for the agreement to continue "in full force and effect" even after divorce. Paragraph 5 contained no language conditioning Bonnie's "lifetime" benefit on her remaining married to Raleigh. Paragraph 7, by contrast, created an explicit financial incentive for Bonnie to stay married to Raleigh, providing a $100,000 payment to Bonnie if they were still married when Raleigh died.

The post-nuptial agreement also contained a fee-shifting provision. Paragraph 21 provided that, if either party defaulted in their obligations, the other could recover attorney fees incurred in suing to "compel compliance" with the agreement.

The marriage lasted only a short time longer. Raleigh filed for divorce in 2004.

In February 2005—while the divorce case was pending—Raleigh established The Raleigh E. Worsham QTIP Trust, naming Raleigh and Bonnie as co-trustees. Although "QTIP" appears in the title, the document does not cite the Internal Revenue Code and does not provide that its validity depends on its qualifying as a QTIP trust under federal tax laws. The trust recites

- 3 -

that it was "established pursuant to the terms of Section 5" of the post-nuptial agreement. Article 8 is entitled "Overriding Tax Purposes" but identifies only "some of [Raleigh's] purposes in creating this trust." Paragraph A ("Marital Deduction") said that he intended the "gift of an income interest" to be a "completed gift qualifying for the gift tax marital deduction." Paragraph B said that "[w]hile I am married to [Bonnie], this trust shall be a grantor trust for federal income tax purposes." And paragraph C said that the "income interest given to my wife shall give her those rights ordinarily associated with ownership of an asset for life."

As required by the post-nuptial agreement, Raleigh transferred the Spring Street property to the trust. Schedule B of the trust document set forth the same payment amounts that the post-nuptial agreement called the "Widow's Benefit," but retitled the payment schedule as the "Monthly Amount." Article 4 made the trust "irrevocable," providing that Raleigh "cannot alter, amend, revoke, or terminate it in any way." Article 5 provided that, during Bonnie's lifetime, the trustee would distribute to Bonnie the net monthly income from the trust.

Less than a month later, the circuit court entered the couple's final decree of divorce. The final decree provided that "the terms of the post-nuptial agreement dated June 10, 2002 are hereby ratified, affirmed, adopted, incorporated, but not merged, approved and expressly made a part of this decree, and the parties hereto are ORDERED to comply therewith."

A few months after they divorced, Bonnie and Raleigh signed a "Supplemental Post-Nuptial Agreement" to settle various disputes that had arisen between them, none of which is pertinent here. That document, however, provided that "[a]ll other portions" of the post-nuptial agreement "shall continue in full force and effect." Raleigh and Bonnie agreed to a consent order in the divorce case incorporating the supplemental agreement.

After the divorce, Bonnie began receiving the income from Spring Street. Raleigh died testate in December 2017. His grandson, defendant Gabriel Seth Worsham ("Seth"), was

appointed executor. As executor, Seth began paying Bonnie $10,000 a month but stopped

distributing income from Spring Street. He subsequently claimed that Bonnie was not entitled to

the monthly payment because she was not Raleigh's "widow."

## II. PROCEEDINGS BELOW

In January 2019, Bonnie—individually and in her capacity as co-trustee of the trust—

sued Seth, individually and as executor of Raleigh's estate.[2] She claimed that Seth breached the

post-nuptial agreement and the trust document by withholding the promised Spring Street

income and by failing to ensure that the trust contained sufficient assets to generate the $10,000

"Monthly Amount" or "Widow's Benefit." Bonnie sought an order compelling Seth to transfer

to the trust additional income-producing assets sufficient to generate at least $10,000 a month in

benefits; awarding "Bonnie, as beneficiary of the trust," judgment against Seth in the amount of

the Spring Street income withheld from the trust; awarding her costs and attorney fees; and

awarding "such additional and further relief [as] the Court deems just and proper."

The circuit court, Judge R. Edwin Burnette, Jr., presiding, denied the parties'

cross-motions for summary judgment, concluding that a trial was necessary because the

post-nuptial agreement was ambiguous and the material facts were in dispute. He reasoned that

"reasonable people" could disagree whether "the use of *wife* in one part of the postnup and

*widow* in the other . . . creates an inconsistency that the trier of fact is entitled to decide. I can't

make that call." (Emphasis added). Judge Burnette denied Bonnie's motion for reconsideration

and set the case for trial.

---

[2] Raleigh's sons—William Travis Worsham and Raleigh Elroy Worsham—were also made defendants as residual beneficiaries under the trust. Neither appeared, however, and a default was entered against them.

- 5 -

After Judge Burnette retired, the case was assigned to Judge F. Patrick Yeatts. On the day set for trial, Judge Yeatts "*sua sponte*, reopened the summary judgment proceedings and heard additional argument" on the parties' motions. He issued a letter opinion in March 2020, granting Bonnie partial summary judgment on the breach-of-contract claims. Judge Yeatts found that paragraph 5 of the post-nuptial agreement provides "two separate income sources for Bonnie and that the "$10,000 per month for the Widow's Benefit is a separate income source for Bonnie in addition to the Spring Street income." He rejected Seth's argument that Bonnie was not a "widow" entitled to the "Widow's Benefit." Judge Yeatts reasoned that the post-nuptial agreement provides income to Bonnie "during her lifetime" and that she is referred to as "Wife" throughout the document, even in "situations after divorce."

Seth objected to that ruling and moved for reconsideration, submitting two notes purportedly from Raleigh and an unsigned letter from December 2001 between Raleigh's attorneys. Seth also tendered the deposition of Raleigh's lawyer, Paul Feinman, one of the attorneys who drafted the post-nuptial agreement. Seth claims that the trial court erred by refusing to consider those documents. He says they show Raleigh's "clear and expressed intent" that Bonnie "only receive the 'Widow's Benefit' if the parties were married at the time of his death." Opening Br. 18. Judge Yeatts overruled Seth's objection and denied the motion for reconsideration.

The final order directed Seth, as executor, to transfer sufficient assets from Raleigh's estate to generate a gross monthly income of $10,000, "independent of any other" assets owned by the trust. The circuit court also determined that $248,080 was due to be restored to the trust, noting that Seth did not challenge the accuracy of that figure. Bonnie, in her capacity as "Co-Trustee of the Trust," was awarded those "monetary damages against" Seth, as executor.

Bonnie, "in her individual capacity," was awarded reasonable attorney fees and costs in the amount of $132,382.89 under paragraph 21 of the post-nuptial agreement.

Seth moved to set aside the final order, arguing that the damages award to Bonnie as "Co-Trustee of the Trust" was inappropriate because the complaint did not allege that the trust itself had sustained any damages. He also claimed that the attorney-fee award to Bonnie in her individual capacity was improper because her claim arose under the trust, not the post-nuptial agreement. Judge Yeatts denied that motion, finding the attorney-fee award proper and the damages award within the scope of the "general prayer" for relief on the breach-of-contract claim.

Seth noted an appeal to the Supreme Court of Virginia, but the Supreme Court transferred the appeal here under Code § 8.01-677.1, concluding that this appeal arises out of a "domestic relations" matter.[3]

III. ANALYSIS

A. The post-nuptial agreement unambiguously provides lifetime benefits to Bonnie through the trust.

Seth's first five assignments of error challenge Judge Yeatts's decision finding the obligations under paragraph 5 of the post-nuptial agreement to be unambiguous and granting summary judgment to Bonnie. We review "de novo" a trial court's decision granting summary judgment. *VACORP v. Young*, 298 Va. 490, 494 (2020). Moreover, "[w]hether contractual provisions are ambiguous is a question of law and not of fact." *Nextel Wip Lease Corp. v.*

_____

[3] Before January 1, 2022, this Court exercised jurisdiction over appeals from the circuit court in various "domestic relations" matters arising under Title 20, Code § 17.1-405(3)(f) (2020), while the Supreme Court exercised appellate jurisdiction over civil appeals in ordinary breach-of-contract disputes outside the domestic-relations context, Code § 8.01-670(A)(3) (2015). Effective January 1, 2022, this Court now exercises appellate jurisdiction over all such appeals from the circuit court. *See* 2021 Va. Acts ch. 489, Spec. Sess. I (amending Code § 17.1-405(3)).

*Saunders*, 276 Va. 509, 515 (2008). We do not defer to the trial court's determination because "we have an equal opportunity to consider the words of the contract within the four corners of the instrument itself." *Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth.*, 270 Va. 309, 315 (2005) (quoting *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 631 (2002)); *Vilseck v. Vilseck*, 45 Va. App. 581, 588 n.3 (2005) (same).

Seth maintains that the post-nuptial agreement is at least ambiguous about whether Bonnie is entitled to the "Widow's Benefit" for life under the trust referenced in paragraph 5. He claims that the judge should have conducted a trial to evaluate the parol evidence to discern the parties' true intent. We disagree.

The parol-evidence rule controls these questions. *Parol* derives from the Anglo-French term meaning "word" or "speech." 2 *Compact Edition of the Oxford English Dictionary* 2082 (1971). Our Supreme Court said in the mid-19th century that the parol-evidence rule was grounded in "the common law at so early a day [that it] has been uniformly adhered to by the courts both of England and this country ever since." *Towner v. Lucas' Ex'r*, 54 Va. (13 Gratt.) 705, 711 (1857). By the middle of the last century, the rule had "nowhere been more strictly adhered to in its integrity than in Virginia." *Pulaski Nat'l Bank v. Harrell*, 203 Va. 227, 233 (1962). The Supreme Court has commended the rule over the years as "hoary," *White v. Commonwealth*, 158 Va. 749, 758 (1932); "venerable," *Ott v. L&J Holdings, LLC*, 275 Va. 182, 187 (2008); and "founded in wisdom," *Slaughter v. Smither*, 97 Va. 202, 205 (1899). The rule is now "a time-honored fixture in the law of this Commonwealth," *Amos v. Coffey*, 228 Va. 88, 91 (1984), "extend[ing] to every class of contracts reduced to writing," *Hilb v. Peyton*, 63 Va. (22 Gratt.) 550, 564 (1872).

At its essence, the parol-evidence rule provides that "where [the] parties have reduced their contract to a writing [that] imposes a legal obligation in clear and explicit terms[,] the

writing [is] the sole memorial of that contract, and it is conclusively concluded that the writing contains the whole contract, and is the sole evidence of the agreement." *Jim Carpenter Co. v. Potts*, 255 Va. 147, 155 (1998) (quoting *Pulaski*, 203 Va. at 233). It is sometimes called "the 'plain meaning' rule." *Berry v. Klinger*, 225 Va. 201, 208 (1983). When the contract is unambiguous, extrinsic evidence of prior or contemporary discussions, understandings, or agreements, is inadmissible "to contradict or vary the plain language of the instrument itself." *Utsch v. Utsch*, 266 Va. 124, 130 (2003) (quoting 11 Richard A. Lord, *Williston on Contracts* § 33.1, at 556 (4th ed. 1999)).

Failing to respect the parol-evidence rule "would result in unacceptable uncertainty in the law." *Id.* at 129. Without it, "no lawyer would be safe" to advise about how a written contract would be construed, since at some "future" date another party could "contradict or vary the plain language of the instrument itself" by citing "parol evidence of the particular meaning [that] the party affixed to his words, or of his secret intention in making the instrument." *Id*. at 130 (quoting *Williston on Contracts*, *supra,* at 556).

The parol-evidence rule excludes extrinsic evidence more broadly when the writing is a "complete integration"—a comprehensive expression of the parties' agreement—than a "partial integration"—one that does not address all of the terms of the parties' understanding. *E.g.*, *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 225 Va. 508, 515 (1983). If only a partial integration exists, the rule permits the use of some parol evidence, "not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." *Id.* at 515-16 (quoting *High Knob, Inc. v. Allen*, 205 Va. 503, 506 (1964)); *see also Jim Carpenter Co.*, 255 Va. at 156 (same). For a complete integration, by contrast, the rule also bars parol evidence that is offered to "add to or explain the terms of a complete, unambiguous, unconditional, written instrument." *Godwin v.*

*Kerns*, 178 Va. 447, 451 (1941). *See generally* Kent Sinclair, *Law of Evidence in Virginia* § 19-2[b] (8th ed. 2021).

No one has suggested that the post-nuptial agreement here is anything but a complete integration of Raleigh and Bonnie's agreement. Paragraph 29, in fact, says that the agreement represents "the entire understanding of the parties" and there are "no promises or undertakings, written or oral, other than those expressly set forth" in the agreement.[4] And even if Seth had asserted partial-integration status, it would not matter because the rule, even for partial integrations, bars parol evidence that would "contradict or vary" the terms of the writing. *Renner Plumbing*, 225 Va. at 515 (quoting *High Knob*, 205 Va. at 506); *Georgiades v. Biggs*, 197 Va. 630, 634 (1956) (same).

Virginia has recognized several exceptions to the parol-evidence rule. *See generally Shevel's, Inc. v. Se. Assocs., Inc.*, 228 Va. 175, 182-83 (1984). But "[t]he only exception pertinent to this appeal is that the [parol-evidence] rule, by definition, does not apply if the language of the written instrument is ambiguous." *Amos*, 228 Va. at 92.

So the primary question we need to answer is whether paragraph 5 of the post-nuptial agreement unambiguously requires that the trust established by Raleigh provide lifetime benefits to Bonnie, even after divorce. "The search for this plain meaning does not myopically focus on a word here or a phrase there." *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 28 (2019). Rather, the "contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." *Sweely Holdings, LLC v.*

---

[4] While such a "merger" or "integration" clause is not dispositive in proving a complete integration, it provides strong evidence. *See Shevel's, Inc. v. Se. Assocs., Inc.*, 228 Va. 175, 183 (1984) (noting that a merger clause "may impose . . . a heavy burden of persuasion" on the party claiming partial-integration status); Sinclair, *supra* § 19-2[a] ("Formal agreements, especially those with an integration clause, are treated as complete.").

*SunTrust Bank*, 296 Va. 367, 376-77 (2018) (quoting *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 180 n.8 (2016)). "[E]very word, clause, and provision of the [contract] 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention . . . expressed" by the parties. *Erie Ins. Exch.*, 297 Va. at 28 (quoting *Floyd v. N. Neck Ins.*, 245 Va. 153, 158 (1993)).

An ambiguity is not present simply because one could "hypothesize 'opposing interpretations' of the same contractual provision." *Id.* at 29 (quoting *Babcock*, 292 Va. at 179). Rather, "conflicting interpretations reveal an ambiguity only where they are reasonable." *Id.* A "reasonable" interpretation "is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision." *Id.*

Reading the text of paragraph 5 in the context of the entire post-nuptial agreement, we conclude that it is unambiguous and that Seth's contrary construction is unreasonable. To start, paragraph 5 requires Raleigh to establish a trust "for Wife's lifetime benefit." We see nothing in that paragraph or any other part of the agreement to support Seth's claim that Bonnie's "lifetime benefit" would terminate if Raleigh divorced Bonnie.

We disagree with Seth that a termination-upon-divorce requirement can be inferred from the use of defined terms like "Wife" and "Widow's Benefit" in paragraph 5. True, "wife" and "husband" ordinarily denote persons who are married at the time, and Judge Burnette appeared to rely on that notion when denying Bonnie's original summary-judgment motion. The words of an instrument "are normally given their usual, ordinary, and popular meaning." *Riverside Healthcare Ass'n, Inc. v. Forbes*, 281 Va. 522, 530 (2011) (quoting *PMA Cap. Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 358 (2006)). But the ordinary meaning of such terms does not control when, as in this case, "it is manifest from the [instrument] itself that *other definitions are intended.*" *Id*. at 529-30 (quoting *Wallace v. Wallace*, 168 Va. 216, 224 (1937)) (alteration in

- 11 -

original) (emphasis added). Judge Yeatts was right that the introductory clause of the post-nuptial agreement defined Raleigh and Bonnie in *all* cases as "Husband" and "Wife," using those terms "throughout" the agreement to describe the parties' rights and obligations, including "after a divorce." Paragraph 2, for instance, says: "If the parties are *divorced*, any such property will be owned . . . as tenants in common, but *Wife* shall have the sole right to occupy such property during her lifetime." (Emphasis added). And again: "*After* divorce, *Wife* may decide to sell the former marital home . . . ." *Id.* (emphasis added).

The couple used "Widow's Benefit" as a similar, party-defined term. It was the "gross monthly income equal to *what the parties would call* the 'Widow's Benefit,'" the amounts of which were set forth in the schedule that followed. (Emphasis added). That what-the-parties-would-call qualification shows that the meaning of "Widow's Benefit" did not turn on whether Bonnie was *literally* married to Raleigh when he died; it was simply their agreed term for the required monthly benefits to be paid.

That reading is corroborated by the trust document itself. Raleigh sued Bonnie for divorce in 2004 but created the trust in 2005, shortly before the final decree of divorce was entered. Despite that their marital bonds were about to be severed, Raleigh used the phrase "Monthly Amount" in the trust document to describe the same amounts he promised to Bonnie as a "Widow's Benefit" in paragraph 5 of the post-nuptial agreement.

Seth does not persuade us that the parties used "Widow's Benefit" to create an incentive for Bonnie to stay married to Raleigh. When the parties intended a stay-married incentive, they explicitly created one. Paragraph 7 held out the promise of a $100,000 bonus to Bonnie upon Raleigh's death, but "only if Husband and Wife are married at the time of Husband's death." No similar requirement was attached to the "lifetime benefit" in paragraph 5. The use of an explicit stay-married requirement in paragraph 7 shows that the drafters "understood the import of the

- 12 -

chosen language and intended to accomplish a different result" when they did not use that language in paragraph 5. *Elmore v. Va. Nat'l Bank*, 232 Va. 310, 315 (1986).

What is more, Seth ignores that paragraphs 24 and 35 of the post-nuptial agreement are all but dispositive of the parties' desire that the trust obligations in paragraph 5 survive divorce. Paragraph 24 ("Subsequent Divorce") provided that if either party filed for divorce, each party promised to ratify and incorporate "but not merge" the agreement into any final divorce decree to ensure that the decree "obligates both of them to perform in accordance with" the agreement's terms. Paragraph 35 ("Effect of Reconciliation") likewise said that the agreement would continue in "full force and effect without abatement . . . following a subsequent separation and/or *divorce* if the parties do reconcile." (Emphasis added). Those paragraphs unambiguously show that the parties intended for the *entire* post-nuptial agreement to survive divorce, including the "lifetime" benefit granted to Bonnie in paragraph 5. Although paragraphs 24 and 35 are key to understanding this case, Seth fails to acknowledge them in either his opening brief or reply brief.

That the parties intended the trust obligations to survive divorce is reinforced again by the Supplemental Post-Nuptial Agreement, signed several months after the final divorce decree. That agreement resolved various disputes that had arisen between the parties but provided that "[a]ll other portions" of the post-nuptial agreement "shall continue in full force and effect." Raleigh and Bonnie would not have said that if the divorce had rendered the trust obligations in paragraph 5 inoperative.

Seth insists that a QTIP trust cannot achieve the tax benefit of deferring estate taxes on the trust corpus unless the surviving spouse is married to the grantor at the time of the grantor's death. He says that a QTIP trust "is a creature of federal tax law that permits a married couple to defer the collection of estate taxes until both spouses die while allowing the grantor to determine how the trust's assets are distributed upon the death of the surviving spouse." Opening Br. 1. To

- 13 -

obtain that tax deferral until the death of the "surviving spouse," as provided in 26 U.S.C. § 2056, the surviving spouse must be married to the grantor at the time of death. *Id*.

Assuming without deciding that Seth's understanding of federal estate-tax law is correct, it does not affect our conclusion that paragraph 5 of the post-nuptial agreement unambiguously required Raleigh to create a trust to provide lifetime benefits to Bonnie in the scheduled amounts, even after their divorce. Seth's counsel conceded at oral argument that the mere fact that the couple divorced before Raleigh died did not defeat or invalidate the trust. Seth agrees that a QTIP trust can have multiple purposes, only one of which is to defer estate taxes until the surviving spouse's death. Another purpose is to provide lifetime income to the grantee. Still another purpose is to protect the corpus of the trust to benefit the grantor's heirs, something common in estate planning among persons in later marriages who have children from a previous marriage (as in Raleigh's case). *See Est. of Shelfer v. C.I.R.*, 86 F.3d 1045, 1048-49 (11th Cir. 1996) ("As divorce and remarriage rates rose, Congress became increasingly concerned with the difficult choice facing those in second marriages, who could either provide for their spouse to the possible detriment of the children of a prior marriage or risk under-endowing their spouse to provide directly for the children.").

The trust Raleigh established accomplishes the second and third purposes even if, owing to the divorce, it does not successfully defer estate taxes until Bonnie's death. The trust still serves the purpose of providing Bonnie the "lifetime benefit" Raleigh promised in paragraph 5 of the post-nuptial agreement. And Seth's counsel agreed at oral argument that the "corpus" of the trust will ultimately pass to Raleigh's "two sons" upon Bonnie's death.

The post-nuptial agreement is not rendered ambiguous, as Seth claims, because Judge Burnette and Judge Yeatts disagreed about how to read it. For one thing, Judge Burnette did not address paragraphs 24 and 35, or the other points set forth above. For another, ambiguity is not

- 14 -

created simply because the parties disagree about the proper interpretation, *Babcock*, 292 Va. at 179, or even when "courts in different jurisdictions" disagree, *Bartolomucci v. Fed. Ins. Co.*, 289 Va. 361, 371 (2015). This Court in *Utsch* found ambiguous the instrument by which the husband conveyed his separately owned real estate to his wife—the wife claimed it was a "true gift," while the husband insisted that it was intended simply to obtain refinancing. *Utsch v. Utsch*, 38 Va. App. 450, 462-63 (2002), *rev'd*, 266 Va. 124 (2003). But the Supreme Court reversed, holding that we erred in going beyond the "four corners of the instrument," which declared itself a "deed of gift" and recited that it was in consideration of "love and affection." 266 Va. at 129. We would likewise err to venture beyond the four corners of the post-nuptial agreement, paragraph 5 of which confers a lifetime benefit on Bonnie without regard to whether she stayed married to Raleigh.

Finally, Seth cannot prevail by relying on parol evidence of Raleigh's intent when negotiating the post-nuptial agreement. After Judge Yeatts issued his letter opinion granting summary judgment to Bonnie, Seth asked the court to consider various extrinsic evidence. He offered Raleigh's personal notes from November 2001 that Raleigh had shared with his sons (but not with Bonnie), and a letter from one of Raleigh's lawyers, Paul Feinman, to another of Raleigh's lawyers in December 2001—six months before Raleigh and Bonnie signed the post-nuptial agreement. Opening Br. 17-21.[5] Seth also proffered that Feinman would testify at trial about Raleigh's state of mind and intentions.

The circuit court did not err in rejecting Seth's parol evidence and denying his motion for reconsideration. As already noted, parol evidence "may not be admitted to contradict or vary the

---

[5] These are written documents, not oral statements. But while the term *parol* might suggest that the parol-evidence rule excludes only "oral" statements, the rule also excludes "written" evidence offered to contradict the terms of the parties' written agreement. *Sale v. Figg*, 164 Va. 402, 409 (1935).

- 15 -

clearly expressed terms of a written agreement." *Anden Grp. v. Leesburg Joint Venture*, 237 Va. 453, 458 (1989). Put another way, a party cannot use parol evidence "to first create an ambiguity and then to remove it." *Doswell Ltd. P'ship v. Va. Elec. & Power Co.*, 251 Va. 215, 223 (1996). "Here, the parol evidence relied on . . . directly contradicts the written documents." *Anden Grp.*, 237 Va. at 458. So Seth's evidence was inadmissible at the outset.[6]

In short, the failure of the trust to achieve the federal-estate-tax-deferral benefit of a "QTIP" trust does not prevent it from achieving its other purposes. We see nothing in the text of the post-nuptial agreement or trust to suggest that Bonnie or Raleigh thought otherwise. Raleigh kept his promise to Bonnie: he made the trust "irrevocable," providing the same lifetime benefits to Bonnie that he had promised in paragraph 5 of the post-nuptial agreement. Accordingly, the trial court did not err in granting summary judgment to Bonnie.

### B. The damages award fits the relief sought in the complaint.

Seth's sixth assignment of error challenges the circuit court's refusal to strike Bonnie's damages evidence and set aside the monetary award of $248,080 to Bonnie in her capacity as "Co-Trustee of the Trust." Seth does not dispute the amount. The monetary award consists of the value of assets sufficient to generate a gross monthly income of $10,000, along with the income stream from Spring Street. While Seth argued below that Bonnie was not entitled to both income streams, the trial court resolved that controversy in Bonnie's favor, and Seth has not challenged that ruling on appeal. Instead, Seth contends in this assignment of error only that the monetary award conflicted with the prayer for relief in Bonnie's complaint, where she

---

[6] Parol evidence is also "never competent to show merely what one of the parties to a contract thought." *Title Ins. Co. of Richmond v. Howell*, 158 Va. 713, 718 (1932). Because our conclusion that the post-nuptial agreement is unambiguous makes parol evidence inadmissible to contradict its plain terms, we need not reach whether Seth's parol evidence was also inadmissible because he failed to proffer that Raleigh's personal notes and the letter between Raleigh's lawyers were shared with Bonnie or her lawyer before Bonnie signed the agreement.

requested—among other things—a monetary award in her capacity as *beneficiary* of the trust, not as *trustee* of the trust.

In evaluating the trial court's decision on Seth's motion to strike, we take the evidence in the light most favorable to Bonnie, the non-moving party. *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). But whether "a cause of action is sufficiently [pleaded] is a legal issue [that] we review de novo." *TC MidAtlantic Dev., Inc. v. Commonwealth*, 280 Va. 204, 210 (2010).

Seth invokes the general rule that "no court can base its judgment or decree upon facts not alleged or upon a right which has not been pleaded and claimed." *Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp.*, 221 Va. 1139, 1141 (1981). *Ted Lansing* makes clear that "[p]leadings are as essential as proof, and no relief should be granted that does not substantially accord with the case as made in the pleading." *Id.* (quoting *Bank of Giles Cnty. v. Mason*, 199 Va. 176, 180 (1957)). "Every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense." *Id.* (quoting *Potts v. Mathieson Alkali Works*, 165 Va. 196, 207 (1935)).

But Bonnie did not violate the *Ted Lansing* rule.[7]

Seth overlooks that the complaint here sounds in equity, seeking both specific performance and injunctive relief—equitable remedies that permit a trial judge, sitting as chancellor, to award additional, equivalent, or alternative relief in the form of money damages. "Specific performance is an equitable remedy . . . ." *Allen v. Allen*, 66 Va. App. 586, 599 (2016) (quoting *Chattin v. Chattin*, 245 Va. 302, 306 (1993)). So is injunctive relief. *E.g.*, *Wright v. Castles*, 232 Va. 218, 224 (1986). By contrast, "an action for money damages was 'the

---

[7] When asked at oral argument what prejudice Seth suffered because of the alleged pleading deficiency, his counsel identified no unfair surprise or impairment to Seth's ability to defend the case. Because Seth's arguments fail as a matter of law, we do not address whether lack of prejudice is a relevant factor in determining if the relief awarded was properly pleaded.

- 17 -

traditional form of relief offered in the courts of law.'" *Ingram v. Commonwealth*, 62 Va. App. 14, 27 (2013) (quoting *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990)). Even so, "[w]hen a court of equity acquires jurisdiction of a cause for any purpose, the court may retain the entire cause to accomplish complete justice between the parties. Thus, the chancellor may hear legal claims and enforce legal rights by applying remedies available only at law." *Advanced Marine Enters, Inc. v. PRC Inc.*, 256 Va. 106, 122 (1998). The power of equity to award complete relief is sometimes called the "clean-up doctrine." *Funny Guy, LLC v. Lecego, LLC*, 293 Va. 135, 144 (2017); *see* W. Hamilton Bryson, *The Merger of Common-Law and Equity Pleading in Virginia*, 41 U. Rich. L. Rev. 77, 81 (2006). Indeed, "even where no prayer for general relief is included in the bill of complaint, a court in equity may properly grant appropriate relief not specifically requested." *Johnson v. Buzzard Island Shooting Club, Inc.*, 232 Va. 32, 36 (1986).[8]

Put another way, a claim for injunctive relief or specific performance necessarily implies a request for monetary relief as a lesser-included remedy, so much so that a plaintiff need not explicitly pray for money damages as a fallback position. *Winston v. Winston*, 144 Va. 848, 858 (1925). In *Winston*, for instance, the Court held that a complaint praying for specific

---

[8] Since the General Assembly provided for the merger of law and equity, effective January 1, 2006, *see* 2005 Va. Acts ch. 681, § 3, there is now only "one form of civil case, known as a civil action," Rule 3:1. Although that merger created "a single *procedure system* for civil cases in the Commonwealth, it preserves in all respects the distinctions between law and equity, concerning the substance of equitable claims and defenses, rights of action, limitations principles, and the powers and limits on the courts in entertaining such actions." Kent Sinclair & Leigh B. Middleditch, *Virginia Civil Procedure* § 1.14 (7th ed. 2021). *See, e.g.*, *Henderson v. Ayers & Hartnett, P.C.*, 285 Va. 556, 563 (2013) (applying the clean-up doctrine to uphold the trial judge's attorney-fee ruling "because an equity court may decide a collateral legal issue once it has the *res* necessary for the exercise of its jurisdiction"); *accord Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999) ("Notwithstanding the fusion of law and equity by the [federal] Rules of Civil Procedure, the substantive principles of Courts of Chancery remain unaffected." (quoting *Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n.26 (1949))).

performance *alone* is "in all respects the same" as a complaint seeking *both* specific performance *and* money damages, in the alternative. *Id*. at 859-60.

This long-established principle of equity practice is fatal to Seth's argument. Bonnie sought specific performance of Seth's obligation as executor to "transfer additional income producing assets from the Estate to the Trust" to generate the $10,000 monthly benefit. She also asked the court for an order "enjoining" Seth from "taking further action . . . other than the transfer of income generating assets from the Estate to the Trust . . . and issuing a directive to the tenant of Spring Street to remit all rent payments to Bonnie and any successor co-trustee, as trustee(s) of the Trust." The trial judge awarded the functional equivalent of that relief. He ordered Seth (as executor of Raleigh's estate) to transfer sufficient income-generating assets to the trust to meet the $10,000-per-month income obligation. He also ordered Seth to pay the monetary judgment to Bonnie (in her capacity as trustee of the trust) in the amount that Seth had failed to transfer. That monetary award was well within the scope of the equitable relief that Bonnie requested.

The rule in *Ted Lansing* is inapplicable for another reason: the monetary award to Bonnie in her capacity as trustee fit the *general prayer* for relief in the complaint, which requested "such additional and further relief [as] the Court deems just and proper." Compl. 10. "Generally, 'a court of equity may grant proper relief under the general prayer that is consistent with the case stated in the bill of complaint.'" *D'Ambrosio v. D'Ambrosio*, 45 Va. App. 323, 336 (2005) (quoting *Jenkins v. Bay House Assocs., L.P.*, 266 Va. 39, 44 (2003)).

Seth argues that the monetary award to Bonnie in her capacity as "trustee" of the trust conflicts with her separate request for a monetary award in her individual capacity as the trust's "beneficiary." It is true, of course, that "a litigant cannot take inconsistent positions, and for the same reasons, when there is a special prayer, the court cannot under a general prayer grant a

relief inconsistent therewith." *Winston*, 144 Va. at 859; *see also Jenkins*, 266 Va. at 45 ("[A] general prayer will support relief only for those matters placed in controversy by the pleadings and, thus, any relief granted must be supported by allegations of material facts in the pleadings that will sustain such relief.").

But as shown above, the monetary award to Bonnie as trustee aligns with the equitable relief requested, which included specific performance of Seth's obligations to properly fund the trust. That congruence does not become misaligned simply because the complaint *also* requested, as additional or alternative relief, compensatory damages for Bonnie in her capacity as the trust's beneficiary.

*Ted Lansing* was materially different. The counterclaim there relied exclusively on an express-warranty theory, but the trial judge "*sua sponte . . .* interjected" in the jury charge an implied-warranty-of-fitness theory. *Ted Lansing*, 221 Va. at 1140. That "variance" between the proof and pleading was problematic because the facts pleaded "did not support the *legal theory* for the judgment sought." *Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith*, 264 Va. 350, 356 (2002). In this case, by contrast, the judgment rendered is in harmony with the theory of the complaint and the relief requested. So *Ted Lansing* is "inapposite." *Id.*

C. The trial court did not err in awarding attorney fees to Bonnie.

Under the "American rule" applied in Virginia, prevailing litigants generally cannot recover their attorney fees[9] unless permitted by statute, contract, or some other recognized

---

[9] We use *attorney fees* rather than the possessive form *attorney's fees* unless quoting the parties' own documents. Several variations of the term are grammatically correct: *attorney's fees*; *attorneys' fees*; *attorney fees*; *counsel fees*. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 94 (3d ed. 2011). Although *attorney fees* may be "inelegant," it is "increasingly common," operating as "a means to avoid having to get the apostrophe right." *Id.* The Rules of the Supreme Court of Virginia repeatedly use *attorney fees*. *E.g.*, Rules 1:1A, 5:20(g), 5:35 (last amended Nov. 1, 2021). We follow that convention here too.

exception. *E.g.*, *W. Square, L.L.C. v. Commc'n Techs., Inc.*, 274 Va. 425, 433 (2007). The post-nuptial agreement here contained a fee-shifting provision, but the trust document did not. The trial court awarded Bonnie, "in her individual capacity," attorney fees and costs in the amount of $132,382.89 under paragraph 21 of the post-nuptial agreement.

In his seventh and final assignment of error, Seth objects to that award on the ground that this "case arose under the QTIP trust, which does not contain an attorney's fee provision." Seth does not assign error either to the amount of the fee award or to the award of fees to Bonnie in her individual capacity. He argues only that Bonnie's claim arose under the trust, not the post-nuptial agreement. Whether a contract entitles the prevailing party to attorney fees is a question of law that we review "de novo." *Online Res. Corp. v. Lawlor*, 285 Va. 40, 61 (2013).

Seth is mistaken that this case arose only under the trust. That claim contradicts Seth's own arguments, which focus on terms like "Wife" and "Widow's Benefit" in the post-nuptial agreement to support his ambiguity theory. Seth also overlooks that paragraph 5 of the post-nuptial agreement specifically required him, as executor, to transfer "additional assets . . . to the Trust at Husband's death" sufficient to generate the specified monthly amount (called the "Widow's Benefit" in the post-nuptial agreement and the "Monthly Amount" in the trust). Because the trial court found that Seth defaulted in carrying out that obligation, it properly awarded attorney fees to Bonnie under the fee-shifting provision in paragraph 21 of the post-nuptial agreement.

> D. The trial court should decide on remand whether Bonnie is entitled to more attorney fees and costs.

Bonnie claims that she is entitled to attorney fees and costs under paragraph 21 of the post-nuptial agreement for the expense of defending this appeal. She asks us to remand the case under Rule 5A:30(b) for the trial court to make another fee award.

- 21 -

Bonnie's request raises a question that the parties have not addressed. As just discussed, the final order here awarded Bonnie her attorney fees and costs, but only "in her individual capacity." The award of monetary damages, by contrast, was made to Bonnie in her capacity as "Co-Trustee of the Trust." The parties have not briefed whether Bonnie's defense of the appeal of the monetary judgment, awarded to her as trustee under the trust (which contains no fee-shifting provision), entitles her to attorney fees in her individual capacity under the post-nuptial agreement (which provides the only contractual basis for fee-shifting). Furthermore, the first six assignments of error addressed the monetary award; only the seventh addressed the attorney-fees award.

If Bonnie is entitled to appellate fees, it is only under the post-nuptial agreement, not the trust. "Even though claims may be intertwined and have a common factual basis," the moving party must "'establish to a reasonable degree of specificity'" that the attorney fees sought were incurred to litigate issues arising under the contract containing the fee-shifting provision. *W. Square*, 274 Va. at 435-36 (quoting *Ulloa v. QSP, Inc.*, 271 Va. 72, 83 (2006)).

We leave it to the trial court on remand to sort out whether Bonnie is entitled to appellate-attorney fees and costs under paragraph 21 of the post-nuptial agreement, and if so, the proper amount. We likewise leave it to the trial court to decide in the first instance if Bonnie is entitled to attorney fees for litigating the fee issues on remand.

## IV. CONCLUSION

The trial court properly construed the post-nuptial agreement and trust to require a lifetime benefit to Bonnie even if she and Raleigh later divorced. Because the contract documents are unambiguous on this point, the trial court correctly rejected Seth's proffered parol evidence and granted summary judgment to Bonnie. The trial court also properly awarded monetary damages to Bonnie as trustee. The monetary award accomplished the same purpose as

the equitable relief she requested:  remedying Seth's breach of the post-nuptial agreement, making the trust whole, and enabling the trust to carry out its obligations to Bonnie.  The attorney-fees award was also proper.

We therefore affirm the judgment and remand the case for further proceedings consistent with this opinion.  Upon remand, Bonnie may submit to the circuit court a claim for further attorney fees and costs.  The circuit court should award Bonnie additional fees and costs to the extent it determines that they were reasonably and necessarily incurred under paragraph 21 of the post-nuptial agreement.

*Affirmed and remanded.*